### ADDISON et al. v. HURON STEVE-DORING CORP.

### AARON et al. v. BAY RIDGE OPER-ATING CO., Inc.

Nos. 11–12, Dockets 22276, 22277.

United States Court of Appeals
Second Circuit.

Argued Nov. 5, 1952.

Decided March 20, 1953.

Frank, Circuit Judge, dissented.

Max R. Simon and Goldwater & Flynn, New York City, Monroe Goldwater, Max R. Simon, James L. Goldwater and Robert Conrad, New York City, of counsel for appellants.

Holmes Baldridge, Asst. Atty. Gen., Myles J. Lane, U. S. Atty., New York City, and Marvin C. Taylor, Attorney, Department of Justice, Washington D. C., for appellees.

Before SWAN, Chief Judge, and L. HAND and FRANK, Circuit Judges.

SWAN, Chief Judge.

These two actions brought under the Fair Labor Standards Act of 1938, 29 U.S. C.A. § 216(b), involve the claims of longshoremen for unpaid overtime compensation, liquidated damages, attorney's fees and costs, because of the alleged failure of the defendants to pay overtime compensation in accordance with section 7(a) of the Act, 29 U.S.C.A. § 207(a). The period of employment involved is from October 15, 1943 to September 30, 1945.[1] The actions were commenced on October 4, 1945 and the subsequent history of this protracted litigation, which has already once gone to the Supreme Court, is well stated in Judge Leibell's careful and elaborate opinion.[2] He also made very detailed findings of fact, familiarity with which will be assumed.

---

1. The complaints alleged a period commencing October 1, 1943 but on the present trial the plaintiffs abandoned all claims prior to October 15, 1943.

2. Addison v. Huron Stevedoring Corp., 96 F.Supp. 142.

His decision awarded small recoveries to four plaintiffs in the Huron action and to two in the Bay Ridge action, and dismissed on the merits the claims of the others.[3] All twenty-three plaintiffs have appealed, those who had a recovery contending that the sums awarded them were too small.

The plaintiffs were employed under a collective bargaining contract between their employers and a longshoremen's union which provided "straight time hourly rates" for work done within prescribed hours and "overtime hourly rates" for work done outside the straight time hours, with no differential for work in excess of 40 hours per week. The longshoremen worked a varying and irregular number of hours throughout a given workweek, and the same man's workweek might consist of work done partly at "straight time hourly rates" and partly at "overtime hourly rates." The problem of determining the "regular rate" of pay upon which the excess statutory compensation required by section 7(a) of the Fair Labor Standards Act of 1938 is based, was settled by the Supreme Court in June 1948 in the Bay Ridge case.[4] It was there held that what the collective bargaining contract called "overtime hourly rates" was really a "shift differential"; and that the "regular rate" was to be found by dividing the weekly compensation by the hours worked, unless the compensation paid contains some amount that represents an "overtime premium" which was defined as "extra pay for work *because* of previous work for a specified number of hours in the workweek or workday" (italics added);[5] in that event any overtime premium paid may be credited against the obligation to pay statutory excess compensation. The

trial now before us for review was had under the mandate of the Supreme Court permitting the District Court to consider any defense which the employers may have under the Portal to Portal Act and to allow any amendments to the complaint or answer or any further evidence that the court may consider just. During the course of the trial defenses based on further amendment of the Fair Labor Standards Act were allowed to be pleaded.

Judge Leibell sustained defenses under sections 9 and 11 of the Portal Act, 29 U.S.C.A. §§ 258, 260, and under the 1949 amendments of the Fair Labor Standards Act, namely, P.L. 177 and P.L. 393 of the 81st Congress, 1st session, which appear as 29 U.S.C.A. § 207(d)(5), (d)(6), (d)(7), and (g). This resulted, as already stated, in dismissal of most of the claims which were tried.

Part I of the appellants' brief is devoted to an attack upon the constitutionality of the statutes creating these defenses. This court has already sustained the constitutionality of the Portal Act,[6] and the appellants do not ask us to reconsider those decisions but make their point merely to preserve it because the Supreme Court has not yet expressly ruled upon it. In considering the attack upon P.L. 177 and P.L. 393 it will suffice for present purposes to confine attention to 29 U.S.C.A. § 207(d)(7). This in effect provides that there shall be excluded from the "regular rate" at which an employee is employed "extra compensation provided by a premium rate" paid pursuant to a collective bargaining agreement for work outside the hours established in good faith as the "basic" workday or workweek (not exceeding 8 hours

---

3. Although several hundred longshoremen are named as plaintiffs in the two actions, the claims of only 13 plaintiffs in the Huron case and 10 in the Bay Ridge case have progressed to trial and judgment; the claims of the others await the outcome of these appeals.

4. Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 68 S.Ct. 1186, 92 L.Ed. 1502.

5. 334 U.S. at page 465, 68 S.Ct. at page 1197. See also 334 U.S. 466, 68 S.Ct. 1197, where Mr. Justice Reed in the majority opinion says: "Under the defi-

nition, a mere higher rate paid as a job differential or as a shift differential, or for Sunday or holiday work, is not an overtime premium. * * * The higher rate must be paid because of the hours previously worked for the extra pay to be an overtime premium."

6. Battaglia v. General Motors Corp., 2 Cir., 169 F.2d 254, certiorari denied 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425; Darr v. Mutual Life Ins. Co., 2 Cir., 169 F.2d 262, certiorari denied 335 U.S. 871, 69 S.Ct. 166, 93 L.Ed. 415.

or 40 hours respectively) "where such premium rate is not less than one and one-half times the rate established in good faith by the contract or agreement for like work performed during such workday or work-week." The appellants' challenge to this provision is based upon the theory (1) that it was a denial of due process of law to deprive them of their "vested right" to overtime computed in accordance with the Supreme Court's ruling in the Bay Ridge case, and (2) that after the Supreme Court had so decided Congress could not overrule its judgment by declaring in effect that the rights so adjudicated the Act had not given. With respect to point (2) we agree that Congress was incompetent to declare that the Supreme Court had misconstrued the Act or that the Act did not confer the rights which the Court declared that it did. But the amendments should not be interpreted as attempting to do that. What they undertook to do was to deprive the longshoremen of those rights which the Act, as construed by the Supreme Court, had given. If that was beyond Congressional competence, it was not because the Congress encroached upon the constitutional independence of the Court but because the Fifth Amendment forbade such action. Hence the appellants' challenge of constitutionality must stand or fall on the first objection, the denial of due process. The same arguments now advanced with respect to the Fifth Amendment were rejected by this court in upholding the constitutionality of the Portal Act.[7] With respect to P.L. 177 and P.L. 393 the writer of the present opinion is content to rest on what was there said.[8]

■ The appellants further contend that the amendatory statutes cannot be constitutionally applied to deprive counsel of reasonable fees for services already performed and money expended in reliance upon the Act prior to amendment. This matter is discussed in Judge Leibell's opinion, 96 F.Supp. 142 at page 177. He rejected the contention for reasons with which we agree. Furthermore the judgments under review specifically reserve "to plaintiffs' counsel the right to apply for an allowance of counsel fees after the completion of any appeals which may be taken in order to review the judgment in the higher courts." Hence the claim that counsel have already been unconstitutionally deprived of reasonable fees appears to be premature.

■Part II of the appellants' brief attacks the findings and conclusions of the district court in sustaining defenses under sections 9 and 11 of the Portal Act. Pages 154 to 166 of 96 F.Supp. deal with the section 9 defense. Under section 9, 29 U.S.C.A. § 258, the question is whether the defendants' failure to pay overtime in exact conformity with section 7a of the Act "was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States * * *." Judge Leibell held that section 9 was a bar to the plaintiffs' actions except with respect to overtime claims for certain weeks in which a plaintiff was employed as header, gangwayman or assistant foreman and as such received a "skill differential" of 5 cents or 15 cents per hour.[9] In discussing the meaning of "good faith," 96 F.Supp. at page 155, he expressed the view that it requires more than honest belief and must meet an "objective test," that is, the employer must act "as a reasonably prudent man would have acted under the same circumstances." Although the question may not be of importance in the case at bar since the trial court found that the defendants' reliance upon agency rulings and interpretations was in fact reasonable as well as honest, we feel constrained to express disagreement with

7. See note 6, supra.

8. See Moss v. Hawaiian Dredging Co., 9 Cir., 187 F.2d 442, sustaining the constitutionality of P.L. 177 and P.L. 393.

9. As to claims for weeks involving the skill differential, section 9 was held not to be a bar because the employer failed to include in the computation of overtime for that week an amount equal to one and a half times the skill differential, and there was no administrative ruling by any agency of the United States approving this practice. Since the defendants have not appealed and the appellants have not questioned this ruling we do not consider it.

the view that "good faith" must meet an objective standard of reasonableness. If the interpretation which an employer says he put upon an agency ruling is unreasonable, this may indeed cast doubt upon the honesty of his belief in the interpretation he asserts, but we think it is not otherwise relevant. The "good faith" of the statute requires, we think, only an honest intention to ascertain what the Fair Labor Standards Act requires and to act in accordance with it. This is confirmed by comparing the language of section 11, 29 U.S.C.A. § 260, with that of section 9. Section 11 requires the employer's "act or omission" to have been taken not only "in good faith" but also with "reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act". Obviously in section 11 the objective standard of reasonableness is a requirement additional to that of "good faith." It would be unwarranted to construe "good faith" in section 9 to have a meaning different from the same phrase in section 11. Furthermore, we think it clear that Congress must have intended to adopt this meaning. Section 9 presupposes that different governmental agencies may have made ambiguous or even conflicting rulings, interpretations, etc., of the Act. From such rulings the employer must choose the one he honestly believes to be correct, must conform with it and must act in reliance upon it. If he has done this his past conduct is to be excused, even if the ruling he has relied upon is later determined by judicial authority to have been erroneous. For future conduct, however, he may rely only on some written regulation, ruling, etc., of the Administrator of the Wage and Hour Division of the Department of Labor.[10] The appellants argue that there could not be good faith reliance on a ruling of another agency, such as the War Shipping Administration, after the employers knew that the agency primarily charged with enforcement of the Act, the Wages

and Hours Division, had expressed a different view, as it did in the Walling letter of October 15, 1943. We cannot agree. Section 9 authorizes good faith reliance on the ruling of "any" agency.

Turning from the legal interpretation of section 9 to the application of it to the facts, as found by Judge Leibell in great detail, we see no occasion to add to his opinion. It will suffice to say that we have examined the findings and do not think the appellants have shown any of them to be clearly erroneous. We agree with the conclusion that the defense was proven, except as to claims involving the skill differentials.

The other Portal Act defense which was sustained relates to liquidated damages. Section 16(b) of the Fair Labor Standards Act provides for recovery of liquidated damages in an amount equal to the unpaid wages owed pursuant to sections 6 and 7. Consequently, unless the plaintiffs recover for overtime under section 7, they are entitled to no liquidated damages under section 16(b), and do not need the defense provided by section 11 of the Portal Act, except as to the small claims involving "skill differentials" and "cargo differentials." Judge Leibell discusses the section 11 defense and his reasons for awarding no liquidated damages at pages 166 to 168 of 96 F.Supp. For the reasons there stated we think his discretion was properly exercised.

Part III of the appellants' brief deals with several miscellaneous contentions, chief of which is the assertion that the trial court erred in allowing the defendants to credit contract "overtime" payments after eight daily or forty weekly "straight time" hours against the obligation to pay the statutory overtime compensation. This ruling is expressed in number V of the Conclusions of Law and is limited to plaintiffs who performed work as a gangwayman, header or assistant foreman, thus involving the skill differentials.[11] The appellees'

10. Section 10 of the Portal Act, 29 U.S. C.A. § 259.

11. "In any week during the period in suit, wherein any plaintiff performed work as a gangwayman, header or assist- ant foreman after eight hours of straight time work in a day, or after forty hours of work in a week, and received from the defendants premium payments in an amount stated in the collective bargain-

brief points out, correctly we think, that this ruling is immaterial except as to contract overtime rates of less than 150% of contract straight time rates, because 150% overtime rates fall under section 7(d)6, 7(d)7 and 7(g) of P.L. 393, 29 U.S.C.A. § 207(d)(6), 207(d)(7) and 207(g). Contract overtime rates of less than 150% fall outside sections 7(d)6 and 7(d)7 but may come under section 7(d)5 if they were paid *because* the employee had worked in excess of eight hours in a day or forty hours in a workweek; and, if they do fall under section 7(d)5, they are creditable under section 7(g).[12] Judge Leibell stated in his opinion, at page 172 of 96 F.Supp.:

"If an overtime premium of less than full time and a half was paid to a plaintiff because the work was performed at a time outside the clock pattern of the basic workday as fixed by the employment contract but not because the employee had previously worked eight hours in that day, the premium would not be a true overtime payment under the Supreme Court ruling in this case. But where an employee, who had already worked eight contract straight time hours in a day, thereafter received for additional hours in the day a premium payment slightly less than time and one half the contract straight time rate, the inference is warranted that the premium rate actually paid during the additional hours in that day was paid because of the hours previously worked, and the Supreme Court's ruling that it is true overtime would therefore be applicable."

With the first sentence of the above quotation we are in complete accord. The basis for "the inference" stated in the second sentence is not apparent to us. Nor is it, we think, consistent with what the Supreme Court held on the prior appeal. That opinion repeatedly emphasized that what the collective bargaining contract called "overtime hourly rates" was a shift differential paid to the employees who worked during less desirable hours than those described in the "straight time hourly rates."[13] Consequently we agree with the appellants' contention that the "inference" that contract overtime hourly rates were paid *"because* of the hours previously worked" (italics added) is not justified. But it by no means follows, in our opinion, that the trial judge erred in excluding the "contract overtime" premiums in computing the regular rate of pay where these premiums did not amount to fifty percent of the straight time rate because of the presence of a skill differential. For, while the amended provisions in § 7(d)(5) do not authorize this exclusion, it is our opinion that § 9 of the Portal to Portal Act does. Suppose one of the plaintiffs worked ten hours on a given day as an assistant foreman, receiving a straight

---

ing agreement for work done in excess of eight straight time hours in a day, or in excess of forty hours in a week, such premium payments were made because of work previously done and should be excluded from the computation of the plaintiffs' regular rate, and are creditable toward overtime compensation payable pursuant to Section 7 of the Fair Labor Standards Act of 1938, as amended [T. 29 U.S.C. § 207]."

12. Section 7(d)5 of P.L. 393, 29 U.S.C.A. § 207(d)5 provides that there shall be excluded from "the 'regular rate' at which an employee is employed"—

"extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked in excess of eight in a day or forty in a workweek or in excess of the employee's normal working hours or reg-

ular working hours, as the case may be".

Section 7(g) reads as follows:
"(g) Extra compensation paid as described in paragraphs (5)–(7) of subsection (d) shall be creditable toward overtime compensation payable pursuant to this section."

13. For example, 334 U.S. at page 475, 68 S.Ct. at page 1202: "Under the contract we are examining, the respondents' work in overtime hours was performed without any relation as to whether they had or had not worked before. Under our view of § 7(a)'s requirements their high pay was not because they had previously worked but because of the disagreeable hours they were called to labor or because the contracting parties wished to compress the regular working days into the straight time hours as much as possible."

time rate for eight hours and contract over-time for two; for mathematical convenience let it be assumed that the straight time hourly rate was $1.00, plus 15 cents, the skill differential, and that the contract overtime hourly rate was $1.50, plus the fifteen cents. Since the additional fifteen cents an hour received for two hours was not true overtime pay—paid because of work previously done in the day [14]—in the absence of any exculpatory legislation, his regular rate of pay for that day would have been $12.50 (8 × $1.15 plus 2 × $1.65) divided by 10, or $1.25 an hour; hence he would be entitled to an additional $1.25 (2 × 62½ cents) for overtime work. But we have already held that where no skill differential was concerned, the 50 cent contract overtime premium met the statutory overtime requirement by virtue of § 9 of the Portal to Portal Act. Where the employer, without reliance on any administrative decision, has failed to pay a part of the overtime required by the Fair Labor Standards Act, it may be argued that he could not have in good faith supposed himself to be complying with the Act, and that the Portal Act's exoneration should therefore be denied him absolutely. We do not believe this to have been the intention of Congress; to so interpret the law would not only deny credit for the premium, but would increase the employer's liability by reason of a payment which in the absence of a skill differential would satisfy the statute. We therefore find that in the computation of the regular rate in the example given above, the 50 cent contract-overtime premium should be excluded; thus the regular rate would be 8 × $1.15 plus 2 × ($1.65−.50) divided by 10, or $1.15. Thus the employer would be liable for the difference between 8 × $1.15 plus 2 × $1.72½, or $12.65, and the $12.50 already paid. If we correctly understand Judge Leibell's opinion, the credit he allowed for contract overtime payments results in a computation conforming to this rule.

■ In Conclusion XIV(B) the trial court ruled: "If the amount recoverable by any plaintiff for any week is less than $1.00 the doctrine of de minimis non curat lex is applicable." In holding this doctrine applicable the trial judge relied, at page 179 of 96 F.Supp., upon Anderson v. Mr. Clemens Pottery Co., 328 U.S. 680, 692, 66 S.Ct. 1187, 1195, 90 L.Ed. 1515, where Mr. Justice Murphy said, "When the matter in issue [walking time after punching the time clocks] concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded." We do not think this justifies a disregard in the case at bar of all awards of less than a dollar for any one week. The impediment to prompt decision of the action is in computing what is the amount due a plaintiff for each of his workweeks. Once that has been done, all that remains is to add up all the awards. To disregard workweeks for which less than a dollar is due will produce capricious and unfair results. Thus A must be paid the $50 owed him for one week's work, but B may be refused payment of a like sum due him, because it is made up of awards spread equally over 51 or more weeks. In Landaas v. Canister Co., 3 Cir., 188 F.2d 768, 771, the court declined to apply the *de minimis* rule to claims asserted under the Fair Labor Standards Act. We agree with that decision.

The appellants next claim error in the trial court's refusal to include in its judgment provisions for amounts awarded them in the earlier trial before Judge Rifkind, including costs and disbursements, from which the employers took no appeal. But the appellants appealed, the judgment was reversed and the Supreme Court's mandate allowed amendment of the pleadings and the taking of further proof. We believe that this denuded the first judgment of any effect except in so far as Judge Leibell might adopt such findings of Judge Rifkind as he thought right. Moreover, the amendments to section 16(b), 29 U.S.C.A. § 216, have removed the mandatory requirement that plaintiffs who recover judgment shall be

---

14. The amount received by a longshoreman who had worked from 6 A. M. to 4 P. M. would be the same as that received by one who had worked from 8 A. M. to 6 P. M., even though the actual overtime hours worked were compensated at different rates.

awarded in addition a reasonable attorney's fee "and costs of the action."

▮ Finally, the appellants urge that they should be awarded interest on whatever recovery is allowed. They recognize that the Third Circuit has ruled to the contrary in the Landaas case, 188 F.2d 768, 772. We agree with the view there expressed.[15]

We find the judgments correct except as to the *de minimis* point. Because of that error the causes must be remanded for recomputation of the awards affected by the application of the *de minimis* rule; in other respects the judgments are affirmed.

Judgments reversed in part and causes remanded for further proceedings in conformity with this opinion.

L. HAND, Circuit Judge (concurring).

I concur in Judge SWAN's opinion, but I am not entirely satisfied with the grounds on which we rested the constitutionality of the Portal to Portal Act[1] in Battaglia v. General Motors Company.[2] It is true that there is language in some of the cases that appears to hold that in exercising its power to regulate interstate commerce Congress is more free of the Fifth Amendment than it is as to others of its powers; but I do not believe that in the end this will prove a tenable distinction; and, although I should have felt bound to accept our decision, even if I had not agreed with it, I think it not improper to give my reasons for independently reaching the same result. Several times before 1947 the Supreme Court[3] had so interpreted the Fair Labor Standards Act that Congress in that year declared the result to be a "disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers with the results that, if said Act, as so interpreted or claims arising under such interpretations, were permitted to stand," inconveniences, and indeed public disasters, would ensue that were described in the ten specific items that followed. This declaration was a preamble of the kind that has reappeared in recent times; its function now is to justify constitutionally a statute that without it might lack adequate support. When made after adequate hearings and upon timely notice to all who might choose to appear, such "a declaration by a legislature concerning public conditions that by necessity and duty it must know, is entitled at least to great respect";[4] though apparently it is not conclusive, for any party to an action may challenge it.[5] The curious consequences of such a challenge Taney, C. J., set forth at length in Luther v. Borden, 7 How. 1, 41, 42, 12 L.Ed. 581, though he found it unnecessary to decide the point, because the controversy was within that nebulous field, called "political," which courts will not enter. The embarrassments that would necessarily attend a judicial trial of the facts in the declaration at bar—particularly if the trial were to a jury, as Taney, C. J. supposed—would be no less than those in Luther v. Borden; and indeed they might be greater, if we consider the scope of the inquiry and the kind of evidence that Congress accepts and must needs accept, if it is to proceed at all. Happily, in the case at bar we are not faced with that difficulty, and may accept the declaration as it reads, for the plaintiffs put in no evidence to disprove it. If the facts declared be

15. Cf. Greenberg v. Arsenal Bldg. Corp., 2 Cir., 144 F.2d 292, 294, reversed as to interest in Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 715, 65 S.Ct. 895, 89 L.Ed. 1296.

1. § 251 et seq., Title 29, U.S.C.A.

2. 2 Cir., 169 F.2d 254.

3. Tennessee Coal, Iron & Railroad Co. v. Muscoda Local, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949; Jewell Ridge Coal Corp. v. Local 6167, 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534; Anderson v.

Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515.

4. Block v. Hirsh, 256 U.S. 135, 154, 41 S.Ct. 458, 459, 65 L.Ed. 865.

5. Chastleton Corporation v. Sinclair, 264 U.S. 543, 546, 44 S.Ct. 405, 68 L.Ed. 841; Borden's Farm Products Company v. Baldwin, 293 U.S. 194, 209, 210, 55 S.Ct. 187, 79 L.Ed. 281; United States v. Carolene Products Co., 304 U.S. 144, 153, 58 S.Ct. 778, 82 L.Ed. 1234; Woods v. Cloyd W. Miller Co., 333 U.S. 138, 144, 68 S.Ct. 421, 92 L.Ed. 596.

taken as data, the validity of the Act and its later amendments depends upon whether the occasion permitted Congress to release the defendants from a part, though only a small part, of the performance to which their contracts bound them.

The plaintiffs performed all their services between October 15, 1943, and September 30, 1945, at a time when the Supreme Court had not answered the precise question now before us: *i. e.* whether "overtime" in the Act meant something different from "overtime" as the parties understood it. It is quite true that in March, 1944, the Court had declared in another connection that the customary and accepted construction of the parties should not prevail; but this did not appear to everyone to be conclusive as to "overtime"; and before October 15, 1943, a conflict had arisen between the rulings of governmental "agencies," so that an employer who wished to proceed had to choose at his peril which ruling to follow. It does not appear how far the plaintiffs at bar were aware of these divergent interpretations, although the longshoremen's union was fully advised of them; but certainly we should have no warrant for supposing that, as individuals, they relied upon the interpretations that finally prevailed. The existence of these doubts about pay for "overtime," did not, of course, affect the plaintiffs' right to all that was eventually determined to be due, and I agree that that right was "vested" in every sense of that word. However, it is another matter whether the uncertainty that had prevailed and the unexpectedness of the new liabilities were irrelevant upon whether the Act was constitutional.

As I view it, two questions arise: (1) whether it was unconstitutional because it took the plaintiffs' "property for public use without just compensation"; and (2) whether it "deprived" them of property "without due process of law." I agree that

a contract is "properly" within the meaning of both clauses;[6] and I shall assume *arguendo* that the first command is unconditional, so that the Act would have been invalid, if it had attempted to release the defendants from any payment whatever for the plaintiffs' work.[7] In short, I shall assume—though I should hesitate before so holding—that no "public use" can be so urgent as to justify "taking" property without "just compensation." On that hypothesis the first of the two questions I have raised, comes down to whether the Act "took" the plaintiffs' contracts. It has been several times declared that to constitute a "taking" something must be "transferred" to the "taker";[8] and it could be argued that even completely to release the employers from their obligations would not "transfer" anything from their employees to them. That appears to me an extremely narrow view, and I shall assume that the situation was the same as though the payments, from which the employers were released, were "transferred" to them. What I rest on is that a release from a part of their obligations, unlike a release from all of it, was not a "taking" at all. If we were dealing in verbal dialectics, I agree that it would be hard to defend such a distinction, but we are not; we are dealing with a constitutional limitation, and there is no surer way to misapprehend its scope than to ignore its history, and treat it as inspired text. This clause in its origin forbad the seizure of tangible property—land or chattels—by which the owner lost the whole enjoyment of what he had possessed; and it was later extended to intangible property by analogy, for otherwise the fundamental purpose of the original would not have been fully realized. On the other hand it has never been extended to every diminution of an owner's enjoyment of his property. True, the law protects all the uses to which "property" can be put; the word is, indeed, a compendium:

6. Omnia Commercial Co., Inc., v. United States, 261 U.S. 502, 508, 43 S.Ct. 437, 67 L.Ed. 773.

7. Cities Service Co. v. McGrath, 342 U.S. 330, 334, 335, 336, 72 S.Ct. 334, 96 L.Ed. 359.

8. Mitchell v. United States, 267 U.S. 341,

45 S.Ct. 293, 69 L.Ed. 644; United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390; United States v. Petty Motor Company, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729; Kimball Laundry Co. v. United States, 338 U.S. 1, 5, 69 S.Ct. 1434, 93 L.Ed. 1765.

the sum of them. But to deprive the owner of a part of these uses is not to "take" his property; it is a question of degree, like so much else in law. If this were not so, no enforced compromise between the claims of two groups of persons would ever be valid without "compensating" whoever suffered any impairment of the enjoyment of his property; and that would mean that a right, once "vested," could never be circumscribed, no matter how much it might stand in the path of the public interest. The Supreme Court has many times declared the contrary.[9] The Portal to Portal Act was of their kind; it did not "take" from the plaintiffs all that they had earned for statutory "overtime," though it did take a part. So much for the first point.

The second is vaguer in its outlines, since it concerns the validity of Congress's preference of the public interest—including the employers'—over the employees'. Frequently—usually indeed—when a court seeks for some reason to defend such a legislative choice, it says that the statute will stand, unless the choice was "arbitrary," "oppressive," "capricious," or "unreasonable."[10] That obviously conceals what the court is doing, although, so far as I can see, uncertainty is inherent in the situation. Laws involve a forecast of what will happen if they are enforced, and a preference between the interests affected if those forecasts are realized. In this case the declaration states the forecast, though the grounds for the preference are not disclosed, and scarcely could be. Certainly, as *res nova*, all such choices are a "legislative" function, and any judicial review of it must be with a wide reserve. So far as a court believes that it has access to basic axioms, postulates or principles—"Natural Law," human or divine—of course it will invoke them; but in their absence I can see nothing for it but to resort to those standards of choice: *i. e.* "principles of justice" that are part of the accepted political equipment at the time. And the fact that the outcome of a search for these must be to the last degree uncertain should always impose the utmost diffidence upon our review, especially so when one remembers that the mere fact that the law has had enough public support to get itself enacted shows that important public opinion believes the choice to be "just." But, be the search as inconclusive as it may, I can see no escape from it.

In the case at bar I am not aware of any disinterested opinion in this country that would find the choice made abhorrent to prevailing standards of "justice." On the one hand the plaintiffs do of course lose a part of what was theirs; but as to any who knew nothing about the contradictory interpretations and who were working under the old terms, to deprive them of their windfall would not, I believe, be deemed a serious grievance. As to those who knew of the contradictory interpretations of "overtime," so far as they were working for more than they were getting it was on a chance, and they have no more ground for complaint than any other loser on a chance, deliberately accepted. Moreover all were getting what had sufficed to keep them on their jobs throughout the period. Against their disappointment Congress had to weigh the loss to the employers who had in good faith relied upon a ruling favorable to them. True, they too had taken a chance, and, like the last class of employees, they had no greater complaint; but at least their interest matched that of the employees. With the opposed interests so nearly in

**9.** Manigault v. Springs, 199 U.S. 473, 480, 26 S.Ct. 127, 50 L.Ed. 274; Louisville & Nashville R. R. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297; Union Dry Goods Co. v. Georgia Public Service Corp., 248 U.S. 372, 39 S.Ct. 117, 63 L.Ed. 309; Calhoun v. Massie, 253 U.S. 170, 40 S.Ct. 474, 64 L.Ed. 843; Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865; Marcus Brown Holding Co. v. Feldman, 256 U.S. 170, 41 S.Ct. 465, 65 L.Ed. 877; Omnia Commercial Co. v. United States, supra, 261 U.S. 502, 43 S.Ct. 437; Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413; East New York Sav. Bank v. Hahn, 326 U.S. 230, 66 S.Ct. 69, 90 L.Ed. 34; Woods v. Cloyd W. Miller Company, 333 U.S. 138, 68 S.Ct. 421, 92 L.Ed. 596; Lichter v. United States, 334 U.S. 742, 788, 68 S.Ct. 1294, 92 L.Ed. 1694.

**10.** Treigle v. Acme Homestead Association, 297 U.S. 189, 197, 56 S.Ct. 408, 80 L.Ed. 575.

balance, it seems to me, not only that Congress was free to make controlling the indirect effects of the new and unexpected reading of the Fair Labor Standards Act, but that it would have been most recreant in its responsibilities, if it had not done so. I trust I do not undervalue the importance of not disturbing "vested" rights; but the pith and kernel of our well-founded reluctance to do so is because otherwise the hopes of their possessors will be disappointed and they will be unable *pro tanto* to plan their future. I do not believe that that is so imperious an interest as of itself to justify sacrifices of the general interest, no matter how grave; and, in the case of an assurance so contingent and doubtful as was any that these plaintiffs could have had, it would have been shocking to allow the retention of their bonanzas to bring about the evils described in the declaration. For these reasons I think the Act was constitutional.

FRANK, Circuit Judge (dissenting in part).

I agree with my colleagues that the retroactive features of the 1947 Portal-to-Portal Act are valid. I disagree, however, as to the constitutionality of the retroactive aspects of the 1949 and 1950 statutes.

I am mindful that the Supreme Court has become increasingly unwilling to invalidate legislation, especially federal legislation, and that, if the views of an inferior court on such a subject have slight import, those of a dissenting judge on such a court have still less. But as the question of constitutionality is before us in this case, I feel it my judicial duty to express my opinion, no matter how futilely.

The constitutional question, as to the 1949 and 1950 statutes, is this: Can the United States, after the Supreme Court has decided that it owes large sums to some of its citizens, resort to retroactive legislation to destroy the right to those sums, in the ab-

sence of some justifying major social need? Is the doctrine of Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434, extinct? [1]

That the destruction of such a right against the United States was the purpose of these statutes can scarcely be doubted. For everyone agrees that anything which the titular defendants here seemingly owed plaintiffs was, for all practical purposes, actually owed by the United States, under its cost-plus contracts with those defendants. In everything but form, then, the United States is the actual defendant. For that reason, the Attorney General of the United States has conducted the defense of this litigation from its inception. That there was no paramount social need to justify the 1949 and 1950 statutes I shall try to show.

1. After the Supreme Court, in Bay Ridge Operating Co., Inc., v. Aaron, 1948, 334 U.S. 446, 68 S.Ct. 1186, 92 L.Ed. 1502, had held that these plaintiffs, under the Fair Labor Standards Act, were entitled to so-called "clock overtime" for work done during the years 1943–1945, Congress—as a result of urging primarily from the Attorney General—enacted the 1949 and 1950 amendments, which were avowedly designed to wipe out those rights (as well as similar rights of other employees not parties to these suits). Relative to retroactivity, those amendatory statutes were significantly different from the Portal to Portal Act, enacted in 1947.

In 1948, in litigation not involving these plaintiffs, this court, in two decisions, held constitutional the retroactive features of the Portal-to-Portal Act.[2] That Act cancelled rights that had already accrued to employees under the Fair Labor Standards Act—as construed in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515—for overtime compensation and liquidated damages, due for time spent upon an employer's premises prelimi-

---

1. See De La Rama S. S. Co. v. U. S., 344 U.S. 386, 389, 73 S.Ct. 381.

    The United States, in its petition for certiorari on the previous appeal of the cases at bar, referred to "the great pecuniary liability to which the United States would be subjected under the decision below."

2. Battaglia v. General Motors Corp., 2 Cir., 169 F.2d 254; Darr v. Mutual Life Insurance Co., 2 Cir., 169 F.2d 262.

nary to, or after engagement in, the principal activities of the employees. Stating that, thanks to decisions like Ettor v. City of Tacoma, 228 U.S. 148, 33 S.Ct. 428, 57 S.Ct. 773,[3] such retroactive legislation, cutting off consummated statutory rights, would have been invalid if enacted by a State, this court sustained this Act (1) because Congress had enacted it "in the exercise of its commerce power," and (2) because of the grave nation-wide emergency (as recited in the preamble of that Act) created by the Mt. Clemens decision. Those decisions I think correct. Judicial notice supports the legislative recitals as to that emergency: The Supreme Court's interpretation did give rise to liabilities which were "wholly unexpected," and "immense in amount," and which therefore, on a nationwide scale, might well "bring about financial ruin of many employers and seriously impair the capital resources of many others." For doubtless thousands of employers, not on any notice that the Fair Labor Standards Act would be so interpreted, had set aside no reserves and had not otherwise so conducted themselves as to be able to meet these unanticipated liabilities.[4]

2. Vastly different is the background (nowhere mentioned by my colleagues [5]) of the 1949 and 1950 amendatory statutes which are deliberately intended to expunge the Supreme Court's Bay Ridge ruling. Neither of these statutes contains a recital or legislative declaration of any emergency. True, the Senate Committee Report on the 1949 legislation does purport to describe a financial emergency affecting some employers. The House Committee Report, however, says not a word of that sort, but (I shall quote it later) advances a quite different ground for this new statute.

Let us, however, make the assumption that, in such circumstances, we must take the Senate Committee Report alone as the equivalent of a declaration of emergency in the statute itself. Even so, we are not bound by it. See, e. g., Chastleton Corp. v. Sinclair, 264 U.S. 543, 44 S.Ct. 405, 406, 68 L.Ed. 841, where the Court (per Holmes, J.) said of a statute, declaring the existence of an emergency, that "a Court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared." And the Court there and elsewhere has held that the judiciary may use judicial notice in ascertaining the truth of such a legislative declaration.[6] With that in mind, consider the Senate Committee Report: [7] (a) We learn from it (and also from the record in these very cases) that, although there were differences of opinion about the correct construction of the Fair Labor Standards Act concerning "clock overtime," yet from 1943 to 1945 (the period here in question), the defendants here (both the titular defendants and the United States) knew that there were plausible arguments, to say the least, for the construction which the Supreme Court later gave that Act in the Bay Ridge decision.[8] Ac-

3. See also, e. g., Coombes v. Getz, 258 U.S. 434, 442–445, 52 S.Ct. 435, 76 L.Ed. 866; Forbes Pioneer Boat Line v. Board of Commissioners, 258 U.S. 338, 340, 42 S.Ct. 325, 66 L.Ed. 647.

4. Cf. Unexcelled Chemical Corporation v. United States, 345 U.S. 59, 73 S.Ct. 580.

5. Judge HAND'S concurring opinion reads as if the 1949 and 1950 statutes contained the recitals of the Portal-to-Portal Act, and as if the facts there recited applied to those later statutes.

6. See Wolff Packing Co. v. Industrial Court, 262 U.S. 552, 536, 43 S.Ct. 630, 67 L.Ed. 1103; Weaver v. Palmer Bros. Co., 270 U.S. 402, 410, 46 S.Ct. 320, 70 L. Ed. 654; cf. Child Labor Tax Case (Bailey v. Drexel Furniture Co.), 259 U.S. 20, 37, 42 S.Ct. 449, 66 L.Ed. 817; United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543.

7. Senate Report No. 402, 81st Cong., 1st Sess.

8. The Report makes much of the fact that the arrangements for "clock overtime" were the "result of collective bargaining," that "there is no evidence that the bargaining was other than at arms' length," and that the bring of the present suits were "deplored" by the union officials. Were these facts of importance, it might well be that recent disclosures, as to the activities of these union officials, would call for a remand to the trial court to ascertain whether these facts, stated in the Report, were true or whether the Senate Committee had been deceived.

cordingly, that decision was nothing at all like the "wholly unexpected" Mt. Clemens decision which led to the Portal-to-Portal Act. (b) The Senate report states: "While this problem has arisen in a number of industries in this country, it has assumed particular importance in the long-shore and stevedoring industries. * * * Estimates of the possible liability of industry generally vary substantially. The minimum figure which has been cited for the longshore and stevedoring industries is $10,000,000, but other estimates for these industries range up to a figure approximating $300,000,000. In other industries, such as electric and gas utilities, where continuous operations are essential, the potential liability is undetermined but of a substantial nature." Thus, according to this Report, we have a problem which concerns chiefly the longshore and stevedoring industry where, so far as the Committee had reliable information, the total liabilities in question are about $10,000,000; as to other industries, the information is very vague. (c) And we do know these facts: (1) So far as the court reports seem to show, in no other industry has there been any such litigation, a fact which suggests that "clock overtime" was not elsewhere a real problem. (2) The liability for such overtime in this industry is largely covered by "cost plus" contracts, which make the government the real debtor.[9]

Even then if the Senate Committee Report alone is considered the equivalent of a legislative declaration, I think it cannot be said that—with the effects of the Bay Ridge decision (a) of such a relatively small magnitude, (b) confined largely to one industry, and (c) with most (if not all) the money owing by the government—there

was such an emergency as to exempt this retroactive legislation from invalidation under the due-process clause.

But I think the Senate Committee Report, with its recital of a financial emergency, cannot be considered as a substitute for a Congressional declaration in the face of the fact that the House Committee Report (1) is utterly silent as to any financial difficulties of employers due to liabilities under the Supreme Court's Bay Ridge interpretation of the Fair Labor Standards Act, and (2) states merely the following as occasioning the need for the amendatory statute: "The Committee has heard testimony of representatives of labor, management, and the Department of Labor, all of whom are in agreement that the present law, in circumstances such as those considered by the Supreme Court in the Bay Ridge case, is creating serious difficulty in the maintenance of desirable labor standards arrived at through collective bargaining in the longshore, stevedoring, building and construction industries,[10] and that the amendment of the Act to correct this situation is urgently necessary in order to prevent labor disputes which would seriously burden and obstruct commerce. The potential effects of the present overtime requirements on these types of agreements were demonstrated in the negotiations of a new contract for the east coast longshore industry in the fall of 1948. The inability of the parties to agree on a substitute for their traditional work pattern was an obstacle to settling a crippling strike. The anticipation of prompt legislative action to remedy this situation was one of the factors inducing settlement." [11] So the House Committee gave as explanation nothing but factors looking to the future; it said nothing to support retroactivity.[12] In these cir-

9. It was stated on the floor of the House, in debate on this measure, that the government would be liable for 95% of any recoveries. See also note 1, supra.

10. This Report states that the "history of collective bargaining in the longshore and stevedoring industries" had "primarily given rise to the need of this amendment."

11. House Report No. 121, 81st Cong., 1st Sess.

12. Only after this Report was made was the retroactive clause added. But the House Committee made no Report covering that change and suggested no explanation of the need for it.

A member of the House Committee, in the debates on the measure, stated that the Committee had heard no evidence bearing on the retroactive feature or the amount of liabilities under the Bay

cumstances, I think this retroactive legislation finds no support in any emergency.

3. I assume that the concept of substantive due process still has some vitality, and that the doctrine of Ettor v. Tacoma, 228 U.S. 148, 33 S.Ct. 428, 57 L.Ed. 773,[13] applies to the federal legislature, so that the 1949 and 1950 statutes were invalid in confiscating "vested rights" unless justified by a sufficiently grave social crisis. But what constitutes a sufficiently grave social crisis to meet this test presents a difficult problem. In the last analysis, the courts must give the answer, but always with marked respect to the legislature. A decision, however, like that of this court in this case— refusing to nullify a confiscatory statute when no real crisis exists—justifies future legislation that will endanger the sort of society which the great majority of our people cherish. It puts in jeopardy all so-called "vested rights." For it will enable a reckless legislature to gut obligations incurred under private contracts. Worse, it will empower the United States, via its own legislation, to thumb its nose at its own creditors. A constitutional doctrine of that sort, laying the axe to basic American attitudes, attacking our central mores, alarmingly weakens our social cohesion and upsets "that tolerable continuity without which society dissolves."[14] In thus threatening what may be called our social constitution, it likewise threatens our governmental Constitution.

Of course, where (as here) civil liberties are not involved,[15] our courts should be extraordinarily reluctant to hold legislation unconstitutional. But they ought not to shirk the duty of striking down statutes[16] which so clearly go beyond the powers of the legislature under our Constitution. I agree with those who say that—except as to major civil rights and the very few specifically worded constitutional provisions— the criteria of constitutional validity should be flexible, should change with changing circumstances, including in such changing circumstances the profound convictions of most of our citizens. Whether, outside the field of major civil rights, there are fundamentals which, short of constitutional amendments, remain legally unalterable no matter what the alterations in basic social attitudes, need not here be considered. For I am satisfied that today the overwhelming majority of our citizens, if they clearly comprehended the significance for the future of the decision here, would be deeply disturbed. Business men, if well advised, will not shrug it off as one affecting wage-earners only; for the rationale of this decision is far broader. A mere declaration of emergency in a Committee Report becomes by this decision virtually the only necessary basis for a drastic attack on "property" rights. And debts owing (directly or indirectly) from the government can thus neatly be expunged by the government itself.[17]

---

Ridge decision. Congressional Record, Vol. 95, Part 7, p. 9495.

13. There the Court said, 228 U.S. at page 156, 33 S.Ct. at page 430: "The necessary effect of the repealing act, as construed and applied by the court below, was to deprive the plaintiffs in error of any remedy to enforce the fixed liability of the city to make compensation. This was to deprive the plaintiffs in error of a right which had vested before the repealing act—a right which was in every sense a property right. Nothing remained to be done to complete the plaintiffs' right to compensation except the ascertainment of the amount of damage to their property. The right of the plaintiffs in error was fixed by the law in force when their property was damaged for public purposes, and the right so

vested cannot be defeated by subsequent legislation."

14. L. Hand, Mr. Justice Cardozo, 48 Yale L.J. 379 (1939).

15. See, e. g., United States v. Carolene Products Co., 304 U.S. 144, 152 note, 58 S.Ct. 778, 783 note, 82 L.Ed. 1234.

16. See Rostow, The Democratic Character of Judicial Review, 66 Harv.L.Rev. (1952) 193.

17. Thus by a court-proof recital in a Committee report, the government can circumvent the wholesome doctrine of Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434.

"As regards property, security consists in receiving no check, no shock, no derangement to the expectation

I grant that no clear-cut rules of constitutionality are possible. But the 1949 and 1950 statutes represent too gross an incursion on what I think the most modest notions of substantive constitutional limitations.

4. Absent an emergency, the sole asserted justification of this retroactive legislation is that it cut out rights which were but a "windfall." As constitutionality is made to hang on that word, its definition becomes important. The dictionary defines it as an "unexpected acquisition or advantage" or "an unexpected legacy or other gain." Judge LEARNED HAND, in his concurring opinion here, uses it as meaning a right which one obtains either without being aware of it or when acting without reliance upon obtaining it. I take it, then, that we are to understand that if money comes due to a person without his knowledge, the mere fact of that ignorance converts his right to that money into a "windfall," with the consequence that the legislature may validly pass a statute eliminating that right.

Surely it cannot be sound doctrine that "vested rights" are thus vulnerable *(i. e.,* if only the rightholders did not know of their rights when they "vested"), that due process insulates from legislative onslaughts only one's known rights. If that were true, our legislatures would not be restrained by the due process clause from rubbing out rights in any of the following illustrative instances: An heir is ignorant of a legacy; the beneficiary of a trust has not heard of the trust; a party to a con-

tract thinks the other party owes him $1000 but, under judicial decisions of which he has not yet learned, the correct amount is $15,000; a third-party beneficiary under a contract has not been notified that there is such a contract; a man buys a corporate bond for $200 and, under a subsequent unexpected court decision, it gives him security, of which he did not know when he bought the bond, that makes it worth $800.[18] If the "windfall" contention can stand up, then the Supreme Court in Ettor v. Tacoma, 228 U.S. 148, 33 S.Ct. 428, 57 L.Ed. 773, would have sustained the retroactive statute there, if the affected property-owner had not learned of the damage to his property at the time when the damage occurred. Any such doctrine, if thoroughly understood, will shock most Americans. Particularly will it shock them when, as here, it is used by the United States to welsh on its own monetary obligations.

The "windfall" argument as used by Judge HAND here, seems to me singularly untenable: Judge HAND says that these longshoremen, entirely apart from their overtime compensation under the Supreme Court's Bay Ridge decision, "were getting what had sufficed to keep them on their jobs throughout the period." [19] But Judge HAND neglects the notorious fact that, despite the collective bargaining agreements,[20] these longshoremen as a class have been badly underpaid for years, and that their recoveries, pursuant to the Supreme Court's decision in this very litigation, would merely have brought them

---

founded on the laws, of enjoying such and such a portion of good. The legislator owes the greatest respect to this expectation which he has himself produced." Bentham, Theory of Legislation (Dumont ed., Hildreth trans., 1864), p. 113.

The instant case is to be distinguished from those dealing with statutes imposing a penalty or forfeiture, or conferring privileges not yet exercised when the retroactive legislation was enacted.

18. Think of unborn beneficiaries, or the rights of infants and idiots.

19. Judge HAND, at the end of his opinion, says "it would have been shocking to al-

low the retention of their bonanzas to bring about the evils described in the declaration." Since there is no "declaration" except in the Portal-to-Portal Act, it may be that, in speaking of "windfalls," he is thinking not of "clock overtime" but of the amounts due, under the Mt. Clemens decision, which the Portal-to-Portal Act erased.

20. If the recent disclosures, referred to in note 8 supra, should turn out to reveal the truth about the activities of the union leaders in this industry, one might perhaps say "because of"— not "despite"—the collective bargaining agreements.

somewhat closer to remuneration compatible with a decent living standard. Judge HAND also neglects the fact that the purpose of the Fair Labor Standards Act was precisely to yield decent wages to workers unable otherwise to command them. That Act intended to insure the employees receipt of such compensation—without any regard whatever to whether they knew, while working, that any such statute existed or that they were entitled to anything under it. If such ignorance transmutes payments under the Fair Labor Standards Act into "windfalls," then all rights under that statute—not merely the rights in question here—were "windfalls" to many thousands of workers who, for many months after its enactment, worked in ignorance of that Act.

5. Since the 1949 and 1950 statutes aim to relieve the government of its obligations, perhaps they may be regarded as attempts to authorize a "taking" of the employees' rights without compensation, and are invalid on that ground. Assuming that otherwise they would result in a "taking," Judge HAND holds that they do not because they release not all but only "a part of the obligations." With such a distinction I cannot agree.[21] Again Ettor v. Tacoma, 228 U.S. 148, 33 S.Ct. 428, 57 L.Ed. 773, helps to illuminate the discussion: Suppose that there the retroactive state statute had provided that the "vested" duty to pay the damages should not be wholly destroyed but only reduced 75%; I cannot believe that the Supreme Court would have reached a different conclusion. See, e. g., United States v. Causby, 328 U.S. 256, 264–268, 66 S.Ct. 1062, 90 L.Ed. 1206; State of Mississippi ex rel. Robertson v. Miller, 276 U.S. 174, 179, 48 S.Ct. 266, 72 L.Ed. 517; United States v. Welch, 217 U.S. 333, 339, 30 S.Ct. 527, 54 L.Ed. 787; Duckett & Co. v. United States, 266 U.S. 149, 151, 45 S.Ct. 38, 69 L.Ed. 216; United States v. Pewee Coal Co., 341 U.S. 114, 117, 71 S.Ct. 670, 95 L.Ed. 809.

6. Omitting the camouflage, this is a case in which the United States, having lost a lawsuit in court, transferred the litigation from the courtroom to the legislative committee room, where it won. Our court today in effect decides that Congress, in aid of the Treasury, may thus enter what amounts to a specific judicial decree, in a pending case against the government, reversing the Supreme Court's previous decision as to the correct legal rule applicable to the particular facts of that particular case. Such conduct by a legislature was deemed most unwise, dangerous and undemocratic centuries ago.[22] It seems to me to go directly counter to whatever is sound and desirable in the notion of the separation of governmental powers. For it means that the legislature sits "as a court of review to which parties * * * appeal when dissatisfied with the rulings of the court * * *."[23]

In Town of Koshkonong v. Burton, 14 Otto 668, 104 U.S. 668, 678–679, 26 L.Ed. 886, the Court said: "When counsel, in Ogden v. Blackledge, 2 Cranch 272, 277 [2 L.Ed. 276], announced that, to declare what the law is, or has been, is a judicial power, to declare what the law shall be is legislative, and that one of the fundamental principles of all our government is that the legislative power shall be separated from the judicial, this court interrupted them with the observation that it was unnecessary to argue that point." The Court then went on to decline to give a statute a "retrospective operation, so as to deprive a party of a vested right," saying, "It was not within the constitutional power of the legislature to take from the plaintiff his right, whether arising on express or implied contract, to interest upon interest, if, when the coupons were executed and delivered, he, or the then holder thereof, had such right, under the law of the State."

7. Aside from this issue of constitutionality, I agree with all else that Judge SWAN says except this: Section 9 of the

---

21. I would agree if the injury to the rights (1) were so small as to come within the *de minimis* category or (2) were purely incidental, not direct.

22. Aristotle, Politics, 1292a, 19 et seq.; cf. Nicomachean Ethics, 1137b, 27.

23. See Cooley, Constitutional Limitations (8th ed. 1927) 190–191.

Portal-to-Portal Act uses the test of "good faith in conformity with and in reliance on any administrative ruling," etc. I think this test is not satisfied if an employer acts in good faith in conformity with his incorrect interpretation of a ruling, even if it is reasonable for that particular employer in his peculiar circumstances so to interpret it. I construe Section 9 to require that he must *(inter alia)* act in conformity with the correct interpretation of the ruling, etc. However, on the facts here, the same result follows from Judge SWAN'S construction of Section 9 as from mine.