The **HUMANE SOCIETY OF the UNITED STATES, Humane Society International, Defenders of Wildlife, Royal Society for the Prevention of Cruelty to Animals, Whale and Dolphin Conservation Society, and Earth Island Institute, Plaintiffs,**

v.

**Ron BROWN, Secretary of Commerce, and Warren Christopher, Secretary of State, Defendants.**

**Slip Op. 96–38.**
**Court No. 95–05–00631.**

United States Court of International Trade.

Feb. 16, 1996.

Sierra Club Legal Defense Fund, Patti A. Goldman, for plaintiffs.

Frank W. Hunger, Washington, DC, Assistant Attorney General; Lois J. Schiffer, Washington, DC, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Jeffrey M. Telep, Washington, DC, and Environment & Natural Resources Division, Eileen Sobeck, Washington, DC, and Mark A. Brown, U.S. Department of Justice; and Office of the Legal Adviser, U.S. Department of State, David Balton, Washington, DC, and Office of General Counsel, National Oceanic and Atmospheric Administration, Margaret F. Hayes, of counsel, for defendants.

*Opinion & Order*

AQUILINO, Judge:

This court's slip op. 95–148, familiarity with which is presumed and which is reported at 19 CIT ——, 901 F.Supp. 338 (1995), granted in part and denied in part defendants' motion to dismiss the complaint, denied plaintiffs' application for immediate equitable relief, and granted leave to conduct limited discovery. Among other things, that opinion shows that the defendants are being sued in their official capacities as U.S. Secretary of Commerce and Secretary of State in regard to the High Seas Driftnet Fisheries Enforcement Act, Pub.L. No. 102–582, 106 Stat. 4900 (Nov. 2, 1992), section 101 of which provides:

**(a) Denial of port privileges**

**(1) Publication of list**

Not later than 30 days after November 2, 1992, and periodically thereafter, the Secretary of Commerce, in consultation with the Secretary of State, shall publish a list of nations whose nationals or vessels conduct large-scale driftnet fishing beyond the exclusive economic zone of any nation.

**(2) Denial of port privileges**

The Secretary of the Treasury shall, in accordance with recognized principles of international law—

**(A)** withhold or revoke the clearance required by section 91 of the Appendix to Title 46 for any large-scale driftnet fishing vessel that is documented under the laws of the United States or of a nation included on a list published under paragraph (1); and

**(B)** deny entry of that vessel to any place in the United States and to the navigable waters of the United States.

**(3) Notification of nation**

Before the publication of a list of nations under paragraph (1), the Secretary of State shall notify each nation included on that list regarding—

**(A)** the effect of that publication on port privileges of vessels of that nation under paragraph (1); and

**(B)** any sanctions or requirements, under this Act or any other law, that may be imposed on that nation if nationals or vessels of that nation continue to conduct large-scale driftnet fishing beyond the exclusive economic zone of any nation after December 31, 1992.

**(b) Sanctions**

**(1) Identifications**

**(A) Initial identifications**

Not later than January 10, 1993, the Secretary of Commerce shall—

**(i)** identify each nation whose nationals or vessels are conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation; and

**(ii)** Notify the President and that nation of the identification under clause (i).

**(B) Additional identifications**

At any time after January 10, 1993, whenever the Secretary of Commerce has reason to believe that the nationals or vessels of any nation are conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation, the Secretary of Commerce shall—

**(i)** identify that nation; and

**(ii)** notify the President and that nation of the identification under clause (i).

**(2) Consultations**

Not later than 30 days after a nation is identified under paragraph (1)(B), the President shall enter into consultations with the government of that nation for the purpose of obtaining an agreement that will effect the immediate termination of large-scale driftnet fishing by the nationals or vessels of that nation beyond the exclusive economic zone of any nation.

**(3) Prohibition on imports of fish and fish products and sport fishing equipment**

**(A) Prohibition**

The President—

**(i)** upon receipt of notification of the identification of a nation under paragraph (1)(A); or

**(ii)** if the consultations with the government of a nation under paragraph (2) are not satisfactorily concluded within ninety days, shall direct the Secretary of the Treasury to prohibit the importation into the United States of fish and fish products and sport fishing equipment (as that term is defined in section 4162 of Title 26) from that nation.

**(B) Implementation of prohibition**

With respect to an import prohibition directed under subparagraph (A), the Secretary of the Treasury shall implement such prohibition not later than the date that is forty-five days after the date on which the Secretary has received the direction from the President.

**(C) Public notice of prohibition**

Before the effective date of any import prohibition under this paragraph, the Secretary of the Treasury shall provide public notice of the impending prohibition.

**(4) Additional economic sanctions**

**(A) Determination of effectiveness of sanctions**

Not later than six months after the date the Secretary of Commerce identifies a nation under paragraph (1), the Secretary shall determine whether—

**(i)** any prohibition established under paragraph (3) is insufficient to cause that nation to terminate large-scale driftnet fishing conducted by its nationals and vessels beyond the exclusive economic zone of any nation; or

**(ii)** that nation has retaliated against the United States as a result of that prohibition.

**(B) Certification**

The Secretary of Commerce shall certify to the President each affirmative determination under subparagraph (A) with respect to a nation.

**(C) Effect of certification**

Certification by the Secretary of Commerce under subparagraph (B) is deemed to be a certification under . . . [22 U.S.C. § 1978(a) ], as amended by this Act.

16 U.S.C. § 1826a. Among other statutes, this Enforcement Act amended Title 22, U.S.C., governing Foreign Relations and Intercourse, in particular, the so-called Pelly Amendment to the Fishermen's Protective Act of 1967, expanding its purview from "fish products" to "any products from the offending country". *Compare* 22 U.S.C. § 1978 (1988) *with* Pub.L. No. 102–582, § 201, 106 Stat. at 4904 *and* H.R.Rep. 262, Part 1, 102d Cong., 2d Sess. 11 (Oct. 22, 1992).

The primary issues unresolved by slip op. 95–148 are (1) whether or not there is reason to believe that nationals or vessels of Italy are conducting large-scale driftnet fishing[1]

---

**1.** The High Seas Driftnet Fisheries Enforcement Act describes such fishing, in general, as

a method of fishing in which a gillnet composed of a panel or panels of webbing, or a series of such gillnets, with a total length of two and one-half kilometers or more is placed in the water and allowed to drift with the currents and winds for the purpose of entangling fish in the webbing.

16 U.S.C. § 1826c(2)(A). Paragraphs 12–15 and 17 of the complaint, which the defendants admit in their answer, save the last two sentences of 17, add that the panels consist of

non-degradable plastic webbing. Driftnets are sometimes as long as 30 kilometers. Driftnet fishing involves the suspension of driftnets vertically in the water with floats attached to the top of the panel and weights attached to the bottom.

13. Driftnets are placed in the water at night and . . . catch virtually all fish, marine mammals, and sea turtles that cross their paths as they drift in the wind and ocean currents.

14. Driftnets are a nonselective type of fishing gear. A high percentage of the fish caught are not the target of the particular driftnet fishery. These non-target fish species are generally discarded at sea, even where the fish are the target of other fisheries. In some fisheries, only a small proportion of the catch is retained for sale.

15. Because the nets are composed primarily of non-degradable plastic, lost or discarded nets or net fragments continue to "ghost-fish," ensnaring fish and marine mammals as they drift aimlessly in the ocean.

\* \* \* \* \* \*

beyond the exclusive economic zone of any nation and (2) whether or not the plaintiffs have the requisite standing under Article III of the Constitution to obtain a declaration adjudging defendant Brown in violation of 16 U.S.C. § 1826a(b)(1)(B), *supra*, and a writ of mandamus, directing him to implicate Italy formally thereunder.

The plaintiffs address these issues in a motion for summary judgment pursuant to CIT Rule 56, while the defendants adhere to the position that judgment should enter for them upon the administrative record as set forth in their motion pursuant to CIT Rule 56.1. Either way, the court has jurisdiction under 28 U.S.C. § 1581(i)(3) and (4). *See, e.g., Earth Island Institute v. Christopher*, 6 F.3d 648 (9th Cir.1993), and 19 CIT ——, 913 F.Supp. 559, Slip Op. 95–208 (Dec. 29, 1995).

### I

The defendants opposed discovery. However, at the time slip op. 95–148 issued, the court was unable to conclude that the documents which they had filed with the Clerk's office amounted to more than information relevant to the causes of action alleged. Nothing appeared to be even arguably "the contested determination and the findings or report upon which such determination was based" or the "reported hearings or conferences conducted by the agency" contemplated by 28 U.S.C. § 2635(d)(1), CIT Rule 72(a) and the Administrative Procedure Act. 19 CIT at ——, 901 F.Supp. at 350. Whereupon, as indicated, the plaintiffs were granted leave to conduct discovery—"at least for the limited purpose of determining the actual nature and extent of defendants' action(s) and record thereof." 19 CIT at ——, 901 F.Supp. at 352. That is, defendants' motion for a protective order as against the one request to produce documents, three requests (to defendant Brown) for admissions

and the ten written interrogatories which had been served on them was denied.

As just stated (and to be discussed hereinafter), documents were and have been produced. The requests for admissions were as follows:

■ On or before January 10, 1993, the Secretary of Commerce did not identify Italy as a nation whose nationals or vessels are conducting (or were then conducting) large-scale driftnet fishing beyond the exclusive economic zone of any nation.

■ Since January 10, 1993, the Secretary of Commerce has not identified Italy as a nation whose nationals or vessels are conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation.

■ The Secretary of Commerce has identified no nations under the High Seas Driftnet Fisheries Enforcement Act of 1992 as nations whose nationals or vessels are conducting large-scale driftnet fishing beyond the exclusive economic zone of any nations.

Defendant Brown has now admitted each. *See* Plaintiffs' Exhibit 80. The few interrogatories presented to the Department of State, seeking information basic to this action, have been responded to *en masse* as follows:

Pursuant to Rule 33(c) of the Rules of the United States Court of International Trade, defendant refers plaintiffs to the administrative record filed with the Court in this action and the documents disclosed to counsel for plaintiffs on September 27, 1995, October 3, 1995, and October 4, 1995 as an adequate supplemental response....

Plaintiffs' Exhibit 63, pp. 2–7. The defendant Secretary of Commerce has been somewhat more forthcoming. For example, in

---

17. Whales, dolphins, sharks, sea turtles, sea birds, and nontarget fish become entangled in large-scale driftnets both when they are deployed and in use for fishing and when they are lost, abandoned or discarded. Such entanglements cause countless deaths of marine mammals, sea turtles, sea birds, and fish. Slow-reproducing species, such as whales and dolphins, are particularly vulnerable to the effects of driftnet fishing.

Similar description is contained in the report to Congress in support of adoption of the act. *See, e.g.*, H.R.Rep. 262, Part 1, 102d Cong., 2d Sess. 4 (Oct. 22, 1992), 1992 U.S.C.C.A.N. 4090–4091 ("large-scale driftnets are distinguished by their method of harvest, indiscriminately killing not only non-targeted fish, but dolphins, whales, turtles and seabirds").

response to plaintiffs' interrogatory number 1, requesting information in his Department's possession "concerning Italian nationals or vessels conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation",

> [d]efendant objects to this interrogatory to the extent it is overly broad, unduly burdensome, and seeks information that is not relevant to this case nor [*sic* ] likely to lead to the discovery of admissible evidence. Pursuant to 28 U.S.C. § 1581(i) and 2635(d), review of this action shall be based upon the administrative record developed before the agency. For this reason, information received, obtained, or collected, that is not present in the administrative record is irrelevant to the disposition of this action.

> In addition, because the Court dismissed Count I of plaintiffs [*sic* ] complaint, information received, obtained or collected before January 10, 1993 is irrelevant to the disposition of this action.

> Further, information received, obtained, or collected after May 3, 1995[ ] is irrelevant to the disposition of this action. Pursuant to 28 U.S.C. §§ 1581(i), 2640(e), and 5 U.S.C. § 706, only final agency actions are judicially reviewable. Pursuant to ... Slip Op. 95–148 (Aug. 18, 1995) at 25–26, the Secretary's decision was final as of the date plaintiffs filed their complaint.

> Finally, pursuant to Rule 33(c) .., defendant refers plaintiffs to the administrative record filed with the Court in this action as an adequate response to this interrogatory. Without waiving the above objections, defendant responds as follows based upon information currently available.

> The National Marine Fisheries Service (NMFS) documents contained in the Administrative Record filed in this case reflect the information the Department of Commerce has received, obtained, or collected about Italian nationals or vessels conducting driftnet fishing. That information, for the most part, does not specify whether driftnet fishing after January 1993 occurred within Italian waters, within the waters of another nation bordering the Mediterranean Sea, or beyond the territorial seas of those nations in the Mediterranean, so that it cannot fairly be characterized as information about "large-scale driftnet fishing beyond the exclusive economic zone of any nation."

> Documents mentioning Italian driftnet fishing, as specified in Plaintiffs' Opposition to Defendants' Motion for a Protective Order at 12, may have been in the possession of Commerce Department employees, but were unknown to the NMFS officials charged with implementation of the High Seas Driftnet Fisheries Enforcement Act ... when this case was instituted.

Plaintiffs' Exhibit 77, pp. 2–4.

### A

■ Whatever the forms of discovery opted for in this case, and whatever their fruits, they do not support defendants' position that their performance(s) have resulted in an administrative record susceptible to judicial review *vel non.* The kind of motion the defendants have interposed pursuant to CIT Rule 56.1 contemplates judgment "solely upon the basis of the record made before an agency", but such restraint of the scope of review assumes administrative action leading to a "determination ... with appropriate reference to the Federal Register". CIT Rule 56.1(c)(1)(A). While the discovery and counsel have now confirmed "the Secretary of Commerce's decision not to identify Italy"[2] and defendants' contention that the statute does not require a negative "formal decision document"[3] has merit, the court is no more persuaded than it was in slip op. 95–148 that the defendants satisfy the record concept of 28 U.S.C. § 2635(d)(1) and CIT Rule 72(a).

### B

Of course, this does not mean that the actions and inactions of the defendants are beyond judicial review, only that the review

---

2. Defendant's Memorandum in Support of Judgment on the Agency Record Pursuant to Rule 56.1 [hereinafter "Defendants' Memorandum"], pp. 2, 13.

3. *Id.* at 2. *See id.* at 49–50.

can be *de novo*. Slip op. 95–148 offered the parties an expedited trial. They have chosen instead to present themselves by way of dispositive motions within the meaning of the rules of practice of this Court of International Trade.

After review and consideration of all the evidence presented, as well as a hearing held thereon, the court concludes that the controlling issues are legal and susceptible to resolution by summary judgment. There is no dispute over facts which requires trial.

In compliance with CIT Rule 56(i), the plaintiffs have submitted a statement of material facts as to which they contend there is no genuine issue to be tried. Adhering to the enumeration of that statement, those facts include:

"2. Neither the Secretary of Commerce nor the Secretary of State has initiated an administrative proceeding to determine whether to identify Italy as a nation whose nationals or vessels are conducting large-scale driftnet fishing on the high seas.

3. The ... record contains no decision document embodying a determination of the Commerce Department, the State Department, the Secretary of Commerce, or the Secretary of State as to whether Italian nationals or vessels are conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation. No document in ... defendants' discovery responses concludes that Italian large-scale driftnet fishing is not occurring in the Mediterranean Sea. There is no explanation in the ... record of why the Secretary of Commerce has not identified Italy under the High Seas Driftnet Fisheries Enforcement Act.

4. The Italian driftnet fleet consists of approximately 500–600 vessels fishing for swordfish and albacore tuna....

5. Fishing operations normally take place from early spring to early fall both in coastal and international waters....

6. Most Italian driftnets are set more than 12 nautical miles offshore and thus in international waters....

7. The Italian Ministry of Merchant Marine commissioned and approved a study that revealed, based on disembarkation surveys, average lengths of large-scale driftnets by port, ranging from a low of 9.64 km. to a high of 16.36 km. for the 1990 and 1991 fishing seasons. .

8. The Italian Ministry of Merchant Marine study also contained data from scientific observers who boarded driftnet vessels and monitored the catch and bycatch.... The observer data show that swordfish comprised less than 18% of the total catch in numbers.... The cetacean bycatch was high, with 1422 cetaceans caught in 1990 and 1682 in 1991....

9. Defendants have this study ... and have been aware of its findings for sometime. The data collected through this study ha[ve] been disseminated at international conferences attended by Commerce Department personnel, among others.

10. The U.S. Embassy in Rome has called this study 'the most accurate snapshot of Italian driftnet use yet undertaken,' ... and the State Department has called it 'the most up-to-date source on the Italian driftnet fishing fleet,'.... The State Department accepts that this study documents a 682–vessel fleet (as of 1990 and 1991) using 3.5 to 30 kilometer long driftnets, with most vessels using nets 10–16 kilometers in length.

11. For years, the State and Commerce Departments have been aware of reports of large-scale Italian driftnet fishing in the Mediterranean Sea....

12. The State Department has reports of Greenpeace surveys of Italian driftnet activities in the Mediterranean Sea in the 1993 and 1994 fishing seasons.... These reports document Greenpeace sightings of driftnet vessels deploying or carrying large-scale driftnets. Each report provides radar measurements of the net lengths, position locations, the time of sightings, vessel names, and registration numbers for some vessels. The 1994 report documents 27 radar measurements of driftnet lengths that exceed 2.5 kilometers.... ... The report's position locations indicate that some of these nets were deployed in international waters.... A dozen of the vessels identified by Greenpeace as carrying oversized driftnets in 1994 had been

cited by Italian authorities for violations of driftnet laws in 1993....

13. Upon receiving Greenpeace's 1993 report, the Chief of the Commerce Department's Marine Mammal Division contacted two Italian scientists who are experts on Italian driftnet fishing. One scientist pointed out that Italian large-scale driftnet fishing is still ongoing, with most vessels using nets between 9 and 14 km.... The other scientist also confirmed that Italian vessels use 10–18 km driftnets, mostly outside the 12 nautical mile territorial waters.... Neither scientist questioned the reliability of the Greenpeace sighting data. Based on this investigation, the Chief of the ... Marine Mammal Division reported to others in the Commerce Department that many Italian driftnets exceed 2.5 kilometers in length, with most nets 9–18 kilometers long, and that the vast majority of driftnet fishing is being conducted outside of the 12–mile coastal band.... The ... [r]ecord does not reflect that anyone in the Commerce or State Department disagreed with the report provided by the Chief of the ... Marine Mammal Division.

14. In July 1995 Greenpeace provided the U.S. Embassy in Rome a summary of sightings made by a Greenpeace vessel in the beginning of the 1995 fishing season. Greenpeace reported encountering an Italian vessel fishing 28 miles off the coast of a Greek island with an estimated 10 kilometer net.... Greenpeace reported the deployment in international waters of two other 8–10 kilometer driftnets by Italian vessels and its seizure of 2.2 and 2.5 kilometer segments of those nets.... Greenpeace reported that it observed another Italian vessel fishing 17 miles southwest of a Greek island. Greenpeace provided the name and registration number of the vessel and reported that its radar showed a 10 kilometer length of the driftnet deployed by that vessel. This vessel had been stopped in April 1995 by Spanish authorities with approximately 12 kilometers of driftnet on board.... Greenpeace reported seeing other large-scale driftnets in international waters and hearing numerous radio warnings of oversized driftnets blocking navigation....

15. The U.S. Embassy in Rome acknowledges that the information provided by Greenpeace about one Italian vessel deploying a large-scale driftnet in international waters is adequate to support a prosecution of the vessel....

16. In conversations and correspondence with U.S. officials documented in the ... [r]ecord, Italian officials have not contested the accuracy of the Greenpeace sighting data. The documents in the ... [r]ecord do not reveal the State or Commerce [D]epartments['] questioning the accuracy of the Greenpeace sighting data.

17. In 1993–1995, the State and Commerce [D]epartments received numerous reports of Spanish interceptions of Italian driftnet vessels....

18. According to Spanish authorities, in April 1994 the Spanish Navy located four Italian driftnet vessels in the national park of Cabrera Archipelago (South of Mallorca), prepared to fish in the waters of the Balearic Sea. Two vessels escaped, but the Spanish authorities detained the other two vessels and found 15 kilometers of net on board each vessel. Spanish authorities confirmed the interceptions to the U.S. Embassy in Madrid ... and described these interceptions of Italian fishing vessels equipped with large-scale driftnets as part of a pattern of incidents in the area over the past year and a half....

19. In July 1994 the U.S. Embassy in Rome received a confirmation from Spanish authorities of another Spanish sighting of three Italian vessels fishing with illegal driftnets....

20. In the 1995 fishing season, the State Department received another report of a Spanish interception of a large-scale Italian driftnet....

21. In 1993 and 1994 the European Commission conducted inspections of Italian driftnet fishing. Based on these inspections, the Commission concluded that a large number of Italian driftnet vessels has continued to fish with driftnets longer than 2.5 km....

22. In 1995, the European Commission's Scientific Technical and Economic Committee for Fisheries (STECF) reported that

Italian vessels continue to use driftnets between 10 and 12 km. for off-shore activity....

23. The European Commission has found that the Italian Government has not implemented the European Union driftnet regulation uniformly or fully.... In 1994, the European Commission reported that Italian national controls and monitoring of driftnets are generally weak....

24. Nothing in the ... [r]ecord or defendants' discovery responses questions the accuracy or reliability of the conclusions reached by the European Commission or its S[TECF].

25. The United Nations and other international organizations have repeatedly raised concerns about the continuation of Italian large-scale driftnet fishing....

26. Italian officials admit that some Italian vessels and nationals have continued to deploy driftnets that are longer than 2.5 kilometers....

27. As of March 1994 a U.S. Ambassador stated that he believed that the Italian Government had not provided credible evidence of measures to bring Italian nationals and vessels into compliance with U.N., EU and Italian driftnet restrictions.... The record does not reflect any disagreement by State or Commerce Department officials with this view.

28. When an Italian official indicated that Italy had focused its enforcement efforts in the Ligurian Sea because enforcement in the southern Mediterranean Sea is difficult, a State Department official responded:

GOI [Government of Italy] claims of successful enforcement in the Ligurian Sea are somewhat irrelevant. The April 1993 report by the defunct Ministry of Merchant Marine (MOMM) on the Italian driftnet fleet ..., still the best source of information on the subject, minimizes the importance of the Ligurian Sea to the swordfish fishery, a fact supported by the relatively small number of vessels based in Sardinia and Northern Italy.... [T]he MOMM report makes clear that the primary fishery is in the Tyrrhenian Sea.

... Nothing in the record contradicts this assessment.

29. When the Italian Government provided more complete descriptions of its enforcement activities in the 1993 fishing season, the data showed that nine violators had home ports in Trapani, which is the base of only 9 vessels, while no violations were found in Palermo, which is the largest home port of driftnet fishing vessels having more than 200 vessels.... Nothing in the record contradicts this assessment. Because the data showed 7000 inspections were conducted in 1993, a State Department official concluded that 'the excuse of lack of enforcement capability should henceforth be treated with skepticism.' ... The record does not reveal any express disagreement with this view by other State or Commerce Department officials.

30. In reviewing the 1993 enforcement data, a State Department official expressed concern that only 5 nets were seized, only 12 fines were levied, and that although 25 violations were referred to judicial authorities, no information was provided regarding whether further action was taken....

31. The State Department concluded that the information supplied by the Italian Government was 'inconclusive data regarding GOI enforcement actions during 1993.' ... This conclusion was conveyed to the Secretary of State....

32. The Italian Government has not provided information concerning the outcome of referrals to judicial authorities.... In light of the failure to provide such information, State Department officials questioned whether the Italian Government is making good faith enforcement efforts.... The record does not reveal the outcomes of referrals to Italian judicial authorities.

33. After the Italian Government provided enforcement information for the 1994 fishing season, the U.S. Embassy in Rome concluded that Italian authorities had stepped up enforcement efforts, but that 'many fishermen continue to try to thwart the law.' ...

34. Data provided by the Italian Government for the 1994 season shows [sic] that 60 Italian driftnet vessels were found to be in

violation of the 2.5 km. driftnet length limit.... The Italian Government has not provided to the United States Government the results of referrals to Italian judicial authorities resulting from these violations.

35. In the fall of 1994, the U.S. Embassy in Rome conducted interviews with Italian fishermen. A cable reports that: 'fishermen freely admitted that their driftnet lengths had grown out of hand;' and 'the common admission is that fishermen try to sneak out of harbor with 8–10 km of net.' ... Some port authorities complained of inadequate enforcement resources ..., and the Embassy concluded that increased resources are needed.... In addition, the cable reports that some port directors told Embassy officials that they have been pressured by fishermen not to enforce driftnet restrictions, and that, after the U.N. moratorium was adopted, the Government of Italy told fishermen to continue as they had been and ignore the law....

36. The U.S. Embassy in Rome was informed in May of 1995 that the Director General of Fisheries ... issued a directive 'advising the Coast Guard that it may no longer confiscate nets longer than 2.5 km unless the fishermen are actually found to be using the longer net to catch fish.' ... The port director of Calasetta told the U.S. Embassy in Rome that he penalized all 11 vessels docked in his port last year, and that his job will be more difficult under the new directive because most driftnet boats use his and other Sardinia ports only as a point of departure to western parts of the Mediterranean.... In 1994, most enforcement activity took place in ports....

37. The Italian Director General of Fisheries told the U.S. Embassy in Rome in March 1995 that 'the EU is not providing assistance, financial or otherwise, to Italy ...' to buttress its driftnet enforcement activities.... European Commission officials have expressed to U.S. officials the view that Italy needs to do more to enforce the EU driftnet regulation.

38. The Italian Government has indicated some support for a program converting driftnets to other types of fishing gear, but that plan has not become law.... The conversion program cannot be funded without approval by the Italian Parliament, and that approval has not yet been provided....

39. In 1994, the Italian Minister of Agriculture ... asked the EU to amend its regulation to permit the use of driftnets up to 9 km. in length in the Mediterranean and to postpone the deadline for eliminating driftnets until 2004.

40. In the spring 1994, the U.S. Embassy in Rome was informed that Italy planned to seek a derogation from the EU driftnet regulation to permit 9 kilometer nets in the Mediterranean Sea....

41. The State Department was aware of reports that the Italian Minister of Agriculture had directed Italian authorities *not* to apply driftnet restrictions until the EU acted on the Italian proposal.... [emphasis in original]

42. The State Department considered Italy's request for a derogation to be an admission that Italian driftnet vessels extensively use driftnets longer than 2.5 km.... The State Department viewed Italy's request for a derogation as revealing a lack of will on the part of the Italian Government to put an end to Italian large-scale driftnet fishing....

43. In response to Italy's plan to seek a derogation from the driftnet restrictions for the Italian fleet, State Department officials called the derogation[ ]

> all but an admission that Italian fishermen are extensively using driftnets greater than 2.5 kilometers in length....

State Department officials made the following statements in response to the derogation request:

> the actions of Italian officials raise doubts about their claim that only a handful of rogue fishermen were engaged in driftnet operations....

> [t]he new administration in Italy has not responded enthusiastically to intense diplomatic pressures ... to stop requesting EU officials to allow the fishery to continue....

Italian officials have, until now, claimed that the issue is primarily an enforcement problem. Our response has generally been that we were seeking evidence of a

good faith effort on the part of the GOI to enforce the driftnet ban.... However, with the GOI now indicating its intent to circumvent existing domestic and international law, it appears that GOI officials either deliberately minimized to us the scale of the violations or the scale of their enforcement difficulties, or both.

...

44. The Secretary of State concluded in November 1993 that 'there is convincing evidence that driftnet fishing is taking place' and 'there is compelling evidence that the Government of Italy ... is aware of the existence of the fishery.' ... This cable was referring to large-scale driftnet fishing.... The U.S. Embassy in Rome also concluded that some illegal Italian driftnet fishing is taking place.... The record does not contain any ... State of Commerce Department officials['] disputing these conclusions.

45. A record of a June 1994 meeting of Commerce and State Department personnel on European driftnetting issues states that '[i]t was the consensus of the group the Italy has overtaken France as the major driftnet problem.' ... A Commerce Department official noted that 'it appears we are headed down the road to certifying Italy.' ... The memorandum states that the ... State Department would 'consider "jumpstarting" the negotiations that ... State would need to initiate once Italy has been fingered as a driftnet fishing country.' ... The record does not reveal any State or Commerce Department officials, disagreeing with these descriptions of what occurred at this meeting.

46. In June 1994, Ambassador David Colson, Deputy Assistant Secretary of State for Oceans, sent Secretary of State Warren Christopher a memorandum stating that '[o]ver the last few years, through vigorous diplomatic effort, the U.S. has effectively brought about an end to large-scale driftnet fishing on the high seas by all countries except Italy.... Italian enforcement of the driftnet ban, however, is weak, and Italy is seeking an exemption from the EU regulation (this appears unlikely to be granted).' ... The letter also states that '[t]his could become a bilateral problem if the Italians continue to resist conforming to the interna-

tional consensus on large-scale driftnets.' ... The record does not contain any documents informing the Secretary of State that Italian compliance with driftnet restrictions has improved since June of 1994.

47. A November 1994 driftnet strategy paper assumed that an identification of Italy under the High Seas Driftnet Fisheries Enforcement Act was then imminent.... Two versions of this document differ with respect to whether such an identification should take place soon in order to improve regulation of the fishery during the 1995 fishing season, or whether the U.S. should continue to seek improvements that might obviate or prolong the need to make such an identification.... The record contains no documents describing which course of action was followed and why.

48. Rather than identify Italy, U.S. officials have repeatedly contacted Italian officials at the highest levels about Italian large-scale driftnet fishing.... As early as November 1993, the U.S. Embassy in Rome presented a demarche to Italian officials raising concerns about Italian noncompliance with the U.N. driftnet moratorium and the prospect of U.S. import prohibitions if Italian violations are not curtailed....

49. Since November 1993, U.S. officials have had numerous diplomatic contacts with their Italian counterparts about Italian large-scale driftnet fishing.

50. High-level U.S. Government officials have tried 'to engage the Italian Government at high diplomatic levels, and provide it an opportunity to take corrective action [on the understanding that] if such action is not forthcoming or satisfactory, further consideration, in consultation with the Department of State, will need to be given to identify Italy['].... The Secretary of Commerce has conceded that these diplomatic efforts proved only 'moderately successful,' ... and the State Department indicated that there has been a 'rebuff of diplomatic efforts to engage Italy.' ... The diplomatic efforts of U.S. Government officials have not brought an end to Italian large-scale driftnet fishing in the Mediterranean Sea.

51. In 1994, the Department of Commerce started the process of obtaining some

assistance from the [U.S.] Coast Guard and the Department of Defense in locating driftnet vessels in the Mediterranean Sea....

52. The Department of Defense has agreed 'to use, on a not-to-interfere basis while otherwise pursuing their primary mission, all-source intelligence assets to monitor, collect and report upon the identity and location of vessels that may be in violation of U.S. laws and international agreements that conserve and manage the living marine resources of the United States.' ...

53. A July 1995 cable from the [U.S.] Navy conceded that 'confusion may exist over interpretation of the phrase "not to interfere basis." ' ... The cable suggests that this phrase had been read in its strictest sense to preclude specific scheduling of missions devoted to locating driftnet fishing vessels....

54. There is no evidence that U.S. military vessels were instructed to or otherwise decided to conduct surveillance activities at night when the driftnets are deployed.

55. It was not until July 1995 that there was a direction that data that should be collected for driftnet vessels located throughout military surveillance activities should include driftnet length....

56. The first reports from the military surveillance were sent to the State Department in the spring of 1994. A State Department official indicated his disappointment at the results:

> The information is pretty useless, as it doesn't contain any data on length of driftnets. Maybe there's a reason why; maybe it's even a good reason.... If CG/DOD can't come up with anything better, our time with them has not been well spent.

...

57. In November 1994, the State Department reported that '[o]ur naval forces have thus far been unable to devote dedicated patrols to driftnet fishing' and that '[t]o date, there have been no confirmed sightings of large-scale driftnets on the high seas areas of the Mediterranean.... In September 1994 a State Department official attributed the lack of confirmed military sightings to higher operational priorities, rather than absence of driftnets in the water.... Nothing in the record disputes this view.

58. Since May of 1994, the [U.S.] Coast Guard has provided biweekly reports on the various Italian fisheries in the Mediterranean Sea. Those reports indicate whether a particular fishery has been active or inactive during the surveillance period.... Nowhere do these reports disclose estimated or measured net lengths.

59. A November 1994 [U.S.] Office of Naval Intelligence cable documents a military sighting of two Italian driftnet vessels deploying oversized driftnets.... The cable indicates that these sightings resulted from surveillance conducted on October 26, 1994. One vessel located 11 nautical miles from the Italian coast was deploying a driftnet 12 nautical miles in length. The other vessel was located 12.5 nautical miles from the Italian coast and thus in international waters. It was deploying a net of 6 nautical miles in length. A nautical mile is 1.852 kilometers. The net measurements were taken by radar. They measured a straight line between the ends of the net. Since driftnets are typically deployed in a zig-zag fashion, the actual net length is likely to be longer than the measurements reflect.

60. An [U.S.] Office of Naval Intelligence cable states that this military sighting 'confirm[ed] illegal driftnets are still being used by Italian fishing vessels.' ..."

■ The court has reviewed all of the evidence cited by the plaintiffs in this statement, the references to which have been redacted for greater ease of reading, and finds that it supports each of the foregoing points. Indeed, the defendants have not formally controverted any part of this statement,[4] which means all are deemed admitted under CIT Rule 56(i).

---

4. The defendants attempt to explain their nonresponse as follows:
> ... [W]e have not responded with a counterdesignation of material facts or cross motion for summary judgment and statement of material facts.[2] These documents are unnecessary to the resolution of this action. As noted above, the administrative agency is the fact finder of first moment. As such, it is charged with the responsibility of weighing the evi-

## C

Having chosen to place this case in the posture just indicated, the defendants are left essentially to draw legal arguments from the facts deemed admitted. They include that the agencies charged with administration of the Driftnet Enforcement Act are entitled to substantial deference and that the Secretary of Commerce has not abused his discretion in not identifying Italy, that is, that that decision is reasonable and supported by the record.

In addition to the Secretaries of Commerce and State, the statute has implicated the U.S. military and Coast Guard per the following provision:

SEC. 202. ENFORCEMENT.

(a) IN GENERAL—Not later than six months after the date of the enactment of this Act, the Secretary of the department in which the Coast Guard is operating, the Secretary of Commerce, and the Secretary of Defense shall enter into an agreement under section 311(a) of the Magnuson Fishery Conservation and Management Act (16 U.S.C. 1861(a)) in order to make more effective the enforcement of domestic laws and international agreements that conserve and manage the living marine resources of the United States.

(b) TERMS.—The agreement entered into under subsection (a) shall include—

(1) procedures for identifying and providing the location of vessels that are in violation of domestic laws or international agreements to conserve and manage the living marine resources of the United States;

(2) requirements for the use of the surveillance capabilities of the Department of Defense; and

(3) procedures for communicating vessel locations to the Secretary of Commerce and the Coast Guard.

106 Stat. 4905, 16 U.S.C. § 1861 note. This gave rise to an October 11, 1993 Memorandum of Understanding Between The Secretary of Transportation, The Secretary of Commerce and The Secretary of Defense Relating to the Enforcement of Domestic Laws and International Agreements That Conserve and Manage the Living Marine Resources of the United States. Defendants' Exhibit 9, Attach. 7. The purpose of this "MOU" is stated to be the "use of the surveillance capabilities of the DOD to identify and locate vessels that may be in violation of United States law and international agreements", in accordance with the following commitment, among others:

The DOD agrees to use, on a not-to-interfere basis while otherwise pursuing their primary mission, all-source intelligence assets to monitor, collect and report upon the identity and location of vessels that may be in violation of U.S. laws and international agreements that conserve and manage the living marine resources of the United States.

Earlier in 1993, a Presidential Review Directive: Oceans, Fisheries, and Fresh Water Resources issued, stating, in part, in regard to driftnets:

U.S. agencies are posed to be vigilant, and contingency plans are in place should the Coast Guard encounter [ ] bandit driftnet fishermen. It is important that we resolve any illegal driftnet problem quickly, as U.S. law requires trade sanctions and other penalties if a country violates the U.N. moratorium. An illegal fishing operation that reflects a violation of government policy and which is resolved

---

dence and resolving any factual disagreements. Although the agency's actions are subject to judicial review, review must be limited to determining whether the agency's decision is based upon substantial evidence in the record. *Federal Mogul Corp. et al. v. United States*, 63 F.3d 1572, 1579 (Fed.Cir.1995). Because of the agency's role, there is no need for a statement and counterstatement of material facts to be filed in the reviewing Court. *Id.* at 4–5. The footnote, 2, to this explanation adds that, while the court confirmed in a sched-

uling order the right of the defendants to file a reply in support of their position, "upon further consideration, we wish to forgo our opportunity to reply and proceed, instead, in accordance with Rule 56.1."

From the court's perspective, suffice it to note that, whatever defendants' tactical choices or perception(s) of their own prerogatives might be, they are not dispositive of the consequences of application of the well-established rules of practice.

quickly and cooperatively with the U.S. should not trigger sanctions.

Defendants' Exhibit 46, p. III–9.

█ Clearly, the orientation of this resultant regime is international, not domestic. And when the orientation is such, judicial deference is at its apogee. Hence, the courts traditionally refrain from disturbing "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations". *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936). On the other hand, when that power emanates, as herein, from an act of Congress, it is appropriate to invoke the judicial duty to say what the law is. *Cf. Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964), and cases cited therein.

█ The section of the act precisely at issue now, 16 U.S.C. § 1826a(b)(1)(B), *supra,* provides that, at any time after January 10, 1993, whenever the Secretary of Commerce "has reason to believe that the nationals or vessels of any nation are conducting large-scale driftnet fishing beyond the exclusive economic zone of any nation", he shall identify that nation and notify the President thereof. The defendants point out that this reason-to-believe standard is not defined in the statute, which reflects congressional commitment to the Secretary's discretion. While this may have been the general expectation, the court has already held the foregoing provision to be mandatory when the facts give reason to believe. *See* 19 CIT at ——, 901 F.Supp. at 350. *Cf. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (when "Congress has directly spoken to the precise question at issue ..., that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress").

The elements of defendant Brown's approach are summarized as follows:

... First, the Secretary must make a determination that a national or vessel of a foreign country is using a large-scale drift-

net.... The driftnet fishing must also occur beyond the exclusive economic zone of any nation. In addition, the driftnet fishing must take place subsequent to January 10, 1993.

Furthermore, before any nation may be subject to identification under 1992 Driftnet Act, the defendants have determined that all these elements require specific corroboration including the name, nationality, and registration information of the vessel ...; the length of the nets deployed in the water ...; the vessel position and the time and date on which the activity occurred.

Defendants' Memorandum, p. 8. If these are the criteria the government has actually relied on, they may have been influenced by the historical goal of maintaining good relations with foreign sovereigns, but the court concludes that they exceed the reason-to-believe requirement as a matter of law. Courts have understood this standard to be objective. *E.g., Addison v. Huron Stevedoring Corp.,* 204 F.2d 88, 93 (2d Cir.), *cert. denied,* 346 U.S. 877, 74 S.Ct. 120, 98 L.Ed. 384 (1953); *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 464 (D.C.Cir.1976), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978); *Marshall v. Brunner,* 668 F.2d 748, 753 (3d Cir.1982); *Beebe v. United States,* 640 F.2d 1283, 1295 (Ct.Cl. 1981). It has been defined, for example, to entail "knowledge of some fact or facts calculated to produce ... a belief in the mind of an ordinarily intelligent man", *Grant v. First Nat'l Bank of Monmouth, Illinois,* 97 U.S. 80, 82, 24 L.Ed. 971 (1878), or "knowledge of other facts which, although not amounting to direct knowledge, would cause a reasonable person, knowing the same facts, to reasonably conclude ...". *Criminal Offense Pattern Jury Instructions* 21 at p. 44 and 25 (11th Cir.1985). *Cf.* Restatement (Second) of Torts § 12(1) (1965). As the Supreme Court has long opined, there is "a wide difference" between belief and knowledge. *E.g., Iron Silver Mining Co. v. Reynolds,* 124 U.S. 374, 384, 8 S.Ct. 598, 603, 31 L.Ed. 466 (1888).

From the record at bar, it appears that the defendants have not recognized this difference. Their approach contemplates not only

actual knowledge of the forbidden activity, they claim to also require "specific corroboration" and "reliable, well-documented reports" and "confirmed, verified sightings". Defendants' Memorandum, pp. 8, 45, 57. Again, maintenance of the best possible foreign relations may commend such surety but the statute under review does not require it.

Applying their strictest criteria, the defendants claim they "have never obtained specific, timely information of large-scale driftnet use by Italian vessels or nationals in the Mediterranean Sea after January 10, 1993". *Id.* at 12. "U.S. naval forces in the Mediterranean have not reported a single well-documented case of large-scale driftnet fishing by Italian nationals or vessels on the high seas." *Id.* at 51. Further:

... Despite ... significant intelligence gathering efforts, the Government has not been able to identify one vessel that fulfills all the criteria for identification.

*Id.* at 53.

█ The exact nature of the referenced "significant intelligence gathering efforts" is not clear from the unclassified information in the record. Suffice it to state that that evidence does not lead this court to find that detection is a simple matter in the absence of such efforts. Determining in the absence of physical custody or control, for example, whether the length of a driftnet, either onboard or deployed on the high seas, exceeds 2.5 kilometers is certainly a sophisticated exercise. Nonetheless, a declassified telegram apparently emanating from the Office of Naval Intelligence in November 1994 "confirms illegal driftnets are still being used by Italian fishing vessels." Defendants' Document ("DefDoc") 314. According to counsel, this confirmation was derived from the fact "that on October 26, 1994, U.S. Naval forces observed and reported positional data on two large-scale driftnets near the Italian coast." Defendants' Memorandum, p. 62.

The court has reviewed all of the documents and materials produced by the defendants in this case, save those still under seal in the absence of any attempt by the plaintiffs to compel disclosure, and finds that they give reason in the mind of an ordinarily intelligent person to believe that Italians continue to engage in large-scale driftnet fishing in the Mediterranean Sea in defiance of the law of their own country and of the rest of the world, *e.g.*:

... The United States is aware of reports of alleged large-scale driftnet fishing in the Mediterranean ... and has undertaken efforts to investigate fully such reports.

DefDoc 22, p. 4 (Submission of the United States to the Secretary–General of the United Nations (Aug. 1993)).

... To my knowledge, there are 700 Italian vessels driftnet fishing in the Mediterranean. According to the Italian Ministry of Merchant Marine report, the number of Italian driftnetters in 1990 was 682. Thus, the Greenpeace/WWF is accurate with respect to the size of the Italian driftnet fleet. However, these vessels are thought to be fishing with nets shorter than the 18–22 kilometers alleged in the Greenpeace/WWF release. The driftnets now employed are supposedly 10–18 km.

DefDoc 27, p. 1 (Fax message from Chief of NMFS Marine Mammal Division to State Dep't Bureau of Oceans and Int'l Environmental and Scientific Affairs (Sept. 3, 1993)).

... [T]he length of driftnets carried by the Italian fleet range from 2–24 km (total length per net on board). However, the majority of vessels use nets between 9 and 14 km.

DefDoc 28, pp. 1–2 (Fax message from Chief of NMFS Marine Mammal Division to State Dep't Bureau of Oceans and Int'l Environmental and Scientific Affairs (Sept. 17, 1993)).

... Although Department concurs with Embassy Rome that NGO reports of large-scale high seas driftnet fishing operations by Italian fishermen are not fully substantiated ..., there is convincing evidence that driftnet fishing is taking place. Moreover, there is compelling evidence ... that the government of Italy (GOI) is aware of the existence of the fishery. The Department has received no responses to its inquiries for information on any enforcement measures taken by Italy or the EU.

... In repeated discussions with Embassy Rome, the GOI has not offered any evi-

dence that it has implemented the UNGA resolution, taken positive action to investigate the matter, or brought its fishermen into compliance.

DefDoc 37, p. 2, paras. 7, 8 (Telegram from Sec'y of State to U.S. embassies in Europe, Republic of Korea, Japan (Nov. 26, 1993)).

... Many Italian fishing vessels using illegal methods, particularly driftnets (for swordfish), both in the upper Yrrhenian [*sic*] Sea and in the region west of Sardinia, [a]s a result of enforcement efforts in the last few months by air-sea elements of the Coast Guard, have moved their fishing activities west toward the edge of Spanish territorial waters near the Balearic Islands, in international waters.

DefDoc 63, p. 1, para. 5 (Telegram from U.S. embassy, Rome to Sec'y of State (March 21, 1994)).

The use of driftnets to fish for swordfish ... is very widespread, Italy being the main user in the Mediterranean with a fleet estimated in 1990 at 682 vessels but this number appears to have been falling since 1991. A large number of Italian driftnet vessels has continued nevertheless to fish with nets longer than 2.5 km.

DefDoc 73, p. 5, para. 4.3 (Communication from the Comm'n of the European Communities re The Use of Large Driftnets Under the Common Fisheries Policy (April 8, 1994)).

... The Italian driftnet fleet consists primarily of relatively small vessels, ranging between 10 and 22 meters in length and weighing between 10 and 25 gross tons. Typically, the Italian fleet uses nylon line driftnets with a mesh size between 36 and 42 centimeters. The nets are generally 25 to 30 meters high, with a useable height (when deployed in water) of 12 to 16 meters. Net length varies from 3.5 to 30 kms, well beyond the 2.5–km. limit set by the UN General Assembly (UNGA) moratorium. Use by Italian fishermen of multifilament polyamide nets measuring 9 to 14.8 kms has been observed off the west coast of Sardinia. Nets are usually set more or less perpendicular to the coastline and are frequently shot in a zig-zag pattern, rather than in a straight line. The nets normally employ passive radar reflec-

tors every 500 to 1800 meters. Deployment time does not necessarily correlate with the length of net, although for a 10–km net the average time of the entire operation is about 12 hours. The nets are often shot in the late afternoon (1600–1700 Hrs); this generally takes 3–4 hours. Retrieval of the nets often begins late at night (0100–2000 Hrs) and is completed by dawn or early morning.

DefDoc 85, p. 27, para. 3 (U.S. Office of Naval Intelligence High Seas Driftnet Enforcement Briefing Book (May 1994)).

Italian officials admit that some illegal driftnet fishing may be taking place, but deny reports that virtually the entire swordfish fleet is operating as it did before the moratorium. In the hope of avoiding a dispute with Italy, the U.S. has repeatedly sought evidence from the GOI of good faith enforcement efforts of its own driftnet regulations. Embassy Rome was provided inconclusive data regarding GOI enforcement actions during 1993.

We were dismayed by the recent announcement of the Minister of Agriculture, Adriana Poli Bortone, that Italy will ask the EU for an exemption to the 2.5 kilometer driftnet limit. Although this move may simply be a political gesture to the fishermen, it comes at a time when the GOI's resolve in enforcing its driftnet regulations is in serious question.

DefDoc 128, p. 3 (Talking Points—Italian Driftnets G–7 Economic Summit (June 28, 1994)).

2. Scioff recently visited port authorities in Porticello, Isola Delle Femmine and Palermo in Sicily, and Calasetta in Sardinia to examine GOI efforts in continued driftnet enforcement this season, and to update our findings at the end of last season. . . .

. . .

3. ... Last year, 60 boats of the 600 in the Italian driftnet fleet were found to be in violation of the 2.5km limit. Each port director said they had at least one coast guard boat out looking for violations at all times. They say this vigilance will continue this year, albeit with a change.

4. As a result of recent finding by the Italian courts, a new directive has been issued by the Director General of Fisheries at the Department of Agriculture, Guiseppe Ambrosio, advising the coast guard that it may no longer confiscate nets longer than 2.5km unless the fishermen are actually found to be using the longer net to catch fish. The courts have found that possession of nets is not sufficient to conclude that the full length of the net will actually be used at one time. Many fishermen, goes the argument, go out for days at a time, and should not have to return to port for more net every time their net breaks or is lost....

5. In Sardinia, the Port Director of Calasetta recounted that, of the eleven Sicilian driftnet boats that docked in his port last year, all eleven were penalized for driftnet length violations. He says his job will be more difficult, perhaps impossible, with the new directive, as Sicilian and Calabrian driftnet boats use Sardinia only as a point of departure to western parts of the Mediterranean, mainly the Spanish Balearics, rather than fishing around Sardinia....

6. All of the Sicilian port directors told of the great pressure fishermen are putting on them to cease and desist their enforcement efforts. Many fishermen are relatives or lifelong friends of the authorities, making their job especially difficult. Also adding to the difficulty has been the wavering position of the GOI on the issue. The director of the port of Isola Delle Femmine said that in the mid-1980's, the GOI issued driftnet fishing licenses very liberally, hence the fleet grew past market saturation to over 600 boats. Then when the GOI supported the UN moratorium on driftnets over 2.5 km, they had not realized that this length was not economically feasible for their fleet. He claims the GOI then told fishermen to continue as they had been and ignore the law. After being pressured by environmentalist groups, in international fora, and by the USG, the GOI finally decided to enforce the law. This vacillating policy has left fishermen frustrated and angry.

7. All the port directors pointed to the fact that a driftnet fisherman cannot make a living using less than eight kilometers of driftnet line since the net is cast in zigzag formation and does not proceed straight backward from the boat. If only 2.5 km are used, the net only extends 500 meters behind the boat. Since swordfish do not travel in schools, the limit is not economically feasible....

DefDoc 234, pp. 1–2 (U.S. Embassy, Rome Report to Washington re Driftnet Enforcement in Italy: 1995 Season (May 3, 1995)).

On its face, such evidence does not support defendants' thesis of lack of any reason to believe large-scale driftnet fishing by Italians continues in the Mediterranean Sea. Nor has defendant Brown shown otherwise in his annual reports to Congress, *e.g.*:

*Mediterranean Sea*

*Italy*—The United States has been aware of persistent reports of Italian swordfish vessels employing large-scale driftnets in the Mediterranean Sea in 1994. However, U.S. Naval forces in the Mediterranean reported no confirmed sightings of Italian large-scale driftnet fishing operations in the Mediterranean in 1994....

To address the alleged illegal driftnet fishing by Italian fishermen, U.S. officials repeatedly called on Italian officials at the highest levels to ensure that Italy's driftnet fleet was in compliance with the UN driftnet moratorium or face U.S. action pursuant to the High Seas Driftnet Fisheries Enforcement Act. These diplomatic efforts proved moderately successful. In July 1994, the Government of Italy stepped up its enforcement efforts and dropped plans to seek its own exemption to EU driftnet regulations. Italian fishery officials requested a budget allocation of $65 million to ensure its fishing fleets' compliance with the driftnet moratorium for 1995–1997.

The United States is encouraged by Italy's recent announcement of an $88 million program to convert the Mediterranean driftnet fleet to other types of fishing gear. Nevertheless, the United States will con-

tinue to watch closely the Italian driftnet situation.[5]

In sum, in view of such a report to the Congress on the eve of commencement of this case and the contents of the rest of what they claim as an administrative record, standing alone, defendants' attempts to place plaintiffs' concerns, which have been "presented repeatedly to the Secretary of Commerce since the enactment of the 1992 Driftnet Act"[6], as exclusively a problem of the past are unfounded. And this court is now constrained to conclude that identification of Italy under 16 U.S.C. § 1826a (b)(1)(B) has been unlawfully withheld and unreasonably delayed and also that the Secretary's decision not to make such identification has been an abuse of discretion and not in accordance with that law within the meaning of 5 U.S.C. § 706. *Cf. Tennessee Valley Authority v. Hill,* 437 U.S. 153, 184, 185, 98 S.Ct. 2279, 2297, 2297, 57 L.Ed.2d 117 (1978) ("endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies", "whatever the cost"); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* —— U.S. ——, ——, 115 S.Ct. 2407, 2413, 132 L.Ed.2d 597 (1995).

### II

Since there is reason to identify Italy under the High Seas Driftnet Fisheries Enforcement Act, it is incumbent upon the court finally to determine what, if any, equitable relief can be granted to the plaintiffs over defendants' continuing objection to their standing.

### A

Initially, as indicated above, defendants' motion to dismiss this action for lack of standing was denied, essentially on the grounds that, for purposes of such a motion, the material allegations of the complaint are taken as admitted and liberally construed in favor of the plaintiffs[7] and that, at first blush, those regarding harm did not appear materially different from allegations considered to be sufficient "injury in fact" in *Japan Whaling Ass'n. v. American Cetacean Soc'y.,* 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). *See* 19 CIT at ——, 901 F.Supp. at 347. Indeed, The Humane Society of the United States was also a party plaintiff in that action, and this court recently has had occasion to point out that neither that organization nor others again at bar are strangers to this kind of litigation. *See Earth Island Institute v. Christopher,* 19 CIT ——, ——, 890 F.Supp. 1085, 1095 (1995), and cases cited therein. Nonetheless, that decision reaffirmed that the plaintiffs must have standing in every action they bring, established at trial or otherwise. *Id.*

### B

To repeat, in this case the plaintiffs have chosen to attempt to establish standing though their summary-judgment motion and argument of counsel thereon. They rely on the declarations and exhibits originally submitted in support of immediate relief, and initially perused by the court in that context[8], as well as on their statement filed in accordance with CIT Rule 56(i), to wit:

"62. Members of all of the plaintiff[ ] organizations obtain great benefit from watching whales and dolphins and other marine life. Declaration of Patricia Forkan ¶¶ 3–9 (June 2, 1995) (Humane Society of the United States [HSUS] and International); Declaration of William J. Snape III ¶¶ 3–7 (May 31, 1995) (Defenders of Wildlife); Declaration of Helen McLachlan ¶¶ 2–3, 13 (June 1,

---

**5.** DefDoc 213, p. 5 (1994 Report of The Secretary of Commerce to The Congress of The United States Concerning U.S. Actions Taken on Foreign Large–Scale High Seas Driftnet Fishing Pursuant to Section 206 of the Magnuson Fishery Conservation and Management Act (Feb. 21, 1995)). *See also* DefDocs 2, 7, 12, 20 and 87.

**6.** Defendants' Memorandum, p. 17. Indeed, plaintiffs' attempted support and encouragement of the government over the years undermined their claim for immediate judicial relief when they finally brought suit last year. *See* 19 CIT at ——, 901 F.Supp. at 348–49.

**7.** 19 CIT at ——, 901 F.Supp. at 340, citing *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404, *reh'g. denied,* 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123 (1969).

**8.** *See* 19 CIT at ——, 901 F.Supp. at 348.

1995) (Royal Society for the Prevention of Cruelty to Animals or RSCPA); Declaration of Chris Stroud ¶¶ 3–8 (May 26, 1995) (Whale and Dolphin Conservation Society or WDCS); Declaration of David C. Phillips ¶¶ 2–4 (May 30, 1995) (Earth Island Institute). RSPCA, WDCS, and HSUS have members who have engaged in whale and dolphin watching activities in and around the Mediterranean Sea and who have specific plans to return to the Mediterranean Sea to engage in such activities in the future. McLachlan Declaration ¶ 13; Stroud Declaration ¶ 7; Forkan Declaration ¶ 7.

63. George Berry is a member of WDCS, who has gone whale watching in the Mediterranean Sea on several occasions. Declaration of George Berry ¶ 1–2 (May 29, 1995). His declaration recites that:

> The first time I went whale watching was off Marbella in southern Spain in 1978. I saw striped and common dolphins. The second time I went was in 1986 off the waters between Sardinia and mainland Italy, where I saw fin whales and several species of dolphins. More recently in 1994 I went whale watching off the southeast coast of France, near Colliure, where a group of bottlenose dolphins live.

*Id.* ¶ 2. Mr. Berry intends to return to the Mediterranean Sea to go whale watching in the fall of 1995.

64. Erich Hoyt is a member of both the ... HSUS[ ] and WDCS, who conducts field research on, and publishes articles and reports about, cetaceans in the Mediterranean Sea and elsewhere. Declaration of Erich Hoyt ¶¶ 1–3 (May 26, 1995). Mr. Hoyt has visited the Mediterranean Sea several times since 1983 to research conservation issues involving marine mammals. *Id.* ¶¶ 4–6. During the course of his field research in the Mediterranean Sea, he has found marine mammals entangled in driftnets. *Id.* ¶ 7. Either during or before the summer of 1996, Mr. Hoyt intends to return to the Mediterranean Sea (and more specifically, to the Ligurian Sea marine reserve which is adjacent to Italian territorial seas) to observe fin whales and other cetaceans. *Id.* ¶ 6.

65. The organizational purposes of the plaintiff organizations include protecting cetaceans from hazards such as driftnet fishing. Forkan Declaration ¶ 3; Snape Declaration ¶ 3; McLachlan Declaration ¶ 3; Stroud Declaration ¶ 3; Phillips Declaration ¶ 3.

66. Members of the plaintiff[ ] organizations are harmed by the diminishing numbers of dolphins and whales in and around the Mediterranean Sea as a result of large-scale driftnet fishing in Italy. Forkan Declaration ¶ 7; Snape Declaration ¶ 7; McLachlan Declaration ¶ 13; Stroud Declaration ¶ 7; Phillips Declaration ¶ 4. Because many cetaceans are migratory, cetacean fatalities from driftnet fishing in the Mediterranean Sea may diminish the number of dolphins and whales that may be viewed by whale and dolphin watchers elsewhere. Members of the plaintiff[ ] organizations who watch whales and dolphins in the Mediterranean Sea may have fewer opportunities to view whales and dolphins and other marine life as a result of Italian large-scale driftnet fishing.

67. Stranding reports show that many stranded cetaceans bear striation marks left by driftnet encounters. In 1986 through 1988, 150 cetacean strandings were recorded, including 24 sperm whales, 10 pilot whales, 68 striped dolphins, 13 bottlenose dolphins, and 5 Risso's dolphin.... A subsequent assessment of the 1986–1990 recorded strandings revealed a total of 934 ..., including 20 fin whales, 56 sperm whales, 17 Cuvier's beaked whales, 18 pilot whales, 39 Risso's dolphin, 125 bottlenose dolphins, and 360 striped dolphins.... Large-scale pelagic driftnetting for swordfish is the principal cause of mortality in those instances where the probable cause of death could be determined....

68. Reported strandings provide only a sampling of the cetacean bycatch. Many cetacean entanglements are left unreported.... Prominent Italian fishery and cetacean experts have estimated that 3000–5000 dolphins or more are entangled in driftnets each year....

69. Striped dolphins are the most common cetacean by-catch of Italian driftnets.... The level of striped dolphin bycatch may create a risk of extinction. Indeed, in 1990, the International Whaling

Commission Scientific Committee concluded that the kill rates for striped dolphin in the Mediterranean Sea were not sustainable, *i.e.*, the mortality rate exceeds the expected replacement rate of the population.... The IWC Scientific Committee attributed what it called 'extremely high' annual kill levels to the Italian swordfish driftnet fishery.... Last year, the International Whaling Commission Scientific Committee reiterated its concern that Italian driftnet fishing was imperilling striped dolphin populations....

70. An estimated ten sperm whales are entangled in driftnets each year, although the reported catch is higher for some years.... Sperm whales are rarely entangled in driftnets in other regions. The International Whaling Commission Scientific Committee has concluded that the available data suggest that the sperm whale kill rate in the Mediterranean Sea is potentially not sustainable.... This is particularly the case if Mediterranean sperm whales are a separate stock from North Atlantic sperm whales.... Sperm whales are listed in Appendix I of the Convention on International Trade in Endangered Species as a species threatened with extinction....

71. If the Secretary of Commerce identifies Italy under the High Seas Driftnet Fisheries Enforcement Act, it would threaten Italy with trade restrictions if an agreement is not reached to end the large-scale driftnet fishing. There is reason to believe that an identification would place pressure on the Italian Government to end Italian large-scale driftnet fishing....

72. An Italian official indicated that the Italian Government would react to trade restrictions by restricting Italian large-scale driftnet fishing....

73. Import restrictions imposed under the Marine Mammal Protection Act's dolphin protection provisions, which prohibit imports of tuna ... caught in a manner that kills or harms excessive numbers of dolphins, have encouraged the use of fishing techniques that do not harm dolphins and have been principally responsible for dramatic reduction in dolphin mortality....

74. In the past, deadlines for compliance with and identifications of countries for violating U.S. driftnet requirements have spurred those countries to take action to comply with the U.S. requirements....

75. Under the Driftnet Impact Monitoring, Assessment, and Control Act of 1987, Pub.L. No. 100–220, Title IV, §§ 4001–4009, 101 Stat. 1477 (1987), the Secretary of Commerce had to certify countries that failed to enter into cooperative enforcement agreements within 18 months of enactment, which would authorize imposition of import restrictions against the certified country. 1987 Act, § 4006(b). Japan negotiated such an agreement just six days before the deadline, and Korea and Taiwan entered into similar agreements after they were certified, but before import restrictions were imposed....

76. Under the Driftnet Act Amendments of 1990, Pub.L. No. 101–627, Title I, § 107(a), 104 Stat. 4441 (1990), the Secretary of Commerce had to list countries that conduct or authorize their nationals to conduct high seas driftnet fishing in a manner that diminishes the effectiveness of or is inconsistent with any international driftnet agreement with the United States. 16 U.S.C. § 1826(e)(6). Such an identification authorizes imposition of import restrictions against the offending country. *Id.* § 1826(f). After a number of Korean and Taiwanese vessels were detected in the North Pacific Ocean north of agreed boundaries, the Secretary of Commerce certified South Korea and Taiwan for violating the terms of their driftnet agreements with the United States.... As a result, both countries took punitive actions against the offending vessels, and agreed to crack down on large-scale driftnet fishing....

77. In his annual reports to Congress, the Secretary of Commerce has repeatedly stated '[a]lthough trade sanctions have never been imposed by the President, Pelly certifications and the threat of sanctions have been, in the main, effective in achieving adequate driftnet agreements and agreement compliance.' ...

78. In the absence of economic pressure, Italy has been unwilling or unable to bring its driftnet fleet into compliance with the

prohibitions on large-scale driftnet fishing...." [9]

As is true of that section of plaintiffs' statement of facts quoted in part I B of this opinion, the defendants have not filed a counterstatement as provided for by CIT Rule 56(i), the effect of which under that provision is to deem plaintiffs' points 62–78 also admitted.

### C

Again, the defendants attempt to demur. That is, whatever the facts, they do not establish standing on the part of any of the named plaintiffs. This argument is subtilized as follows:

1. Plaintiffs' alleged injury is not sufficiently imminent to demonstrate injury-in-fact.
 a. Plaintiffs' claims of vocational harm and general harm to unidentified members are inadequate to demonstrate injury in fact.
 b. The declarations of Messrs. Hoyt and Berry fail to state injury-in-fact with sufficient specificity.
 c. The Supreme Court decisions in *Japan Whaling Association* and *Sierra Club* do not provide legal precedent to find injury-in-fact in this case.
2. Plaintiffs have not demonstrated actual injury.
3. Defendants' conduct did not cause plaintiffs injury, and their injuries are not likely to be redressed by a favorable decision.

Defendants' Memorandum, pp. i–ii.

### (1)

Necessarily, any analysis of the issue raised must refer to Supreme Court teaching. Slip op. 95–148 cited *Sierra Club v. Morton*, 405 U.S. 727, 738, 92 S.Ct. 1361, 1367–68, 31 L.Ed.2d 636 (1972), for the proposition that the

trend of cases arising under the APA and other statutes authorizing judicial review of federal agency action has been toward

recognizing that injuries other than economic harm are sufficient to bring a person within the meaning of the statutory language, and toward discarding the notion that an injury that is widely shared is *ipso facto* not an injury sufficient to provide the basis for judicial review.

19 CIT at ——, 901 F.Supp. at 347. Nevertheless, the Supreme Court held the Sierra Club to be without standing against the defendant Secretary of the Interior to enjoin a Walt Disney Enterprises development of part of the Sequoia National Forest essentially upon the stated rationale that a

mere "interest in a problem," no matter how long-standing the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization "adversely affected" or "aggrieved" within the meaning of the APA. The Sierra Club is a large and long-established organization, with a historic commitment to the cause of protecting our Nation's natural heritage from man's depredations. But if a "special interest" in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide "special interest" organization, however small or short-lived. And if any group with a bona fide "special interest" could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.

405 U.S. at 739–40, 92 S.Ct. at 1368–69.

As for the 1984 complaint of the American Cetacean Society, Animal Protection Institute of America, Animal Welfare Institute, Center for Environmental Education, The Fund for Animals, Greenpeace U.S.A., The Humane Society of the United States, International Fund for Animal Welfare, The Whale Center, Connecticut Cetacean Society, Defenders of Wildlife, and Friends of the Earth that Japan was exceeding harvest quo-

---

**9.** Again, for greater ease of reading, the references stated to support paragraphs 67–78 have been redacted, and again they have been reviewed by the court and found, in fact, to be supportive.

tas promulgated under the aegis of the International Convention for the Regulation of Whaling, the defendant Secretaries of Commerce and of State do not appear to have defended themselves on the ground of those organizations' lack of standing in either the district or circuit court. *See generally American Cetacean Society v. Baldridge*, 604 F.Supp. 1398 (D.D.C.), *aff'd.*, 768 F.2d 426 (D.C.Cir.1985). Moreover, if, as the Supreme Court has opined, the question of standing is in "essence ... whether the litigant is entitled to have the court decide the merits of the dispute"[10], those organizations were held so entitled by that Court per the following reasoning:

> ... [T]he suit ... is one to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), or alternatively, to "hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(A). The "right of action" in such cases is expressly created by the Administrative Procedure Act (APA), which states that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review," § 704, at the behest of "[a] person ... adversely affected or aggrieved by agency action." § 702 (1982 ed., Supp. III). A separate indication of congressional intent to make agency action reviewable under the APA is not necessary; instead, the rule is that the cause of action for review of such action is available absent some clear and convincing evidence of legislative intention to preclude review. *See, e.g., Block v. Community Nutrition Institute*, 467 U.S. 340, 345 [104 S.Ct. 2450, 2454, 81 L.Ed.2d 270] (1984); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 [91 S.Ct. 814, 820, 28 L.Ed.2d 136] (1971); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141 [87 S.Ct. 1507, 1511, 18 L.Ed.2d 681] (1967).
>
> It is clear that respondents may avail themselves of the right of action created by the APA. First, the Secretary's actions constitute the actions of an agency. *See* 5 U.S.C. § 551(1); *Citizens to Preserve Overton Park v. Volpe, supra*, at 410 [91 S.Ct. at 820]. In addition, there has been "final agency action," in that the Secretary formally has agreed with the Japanese that there will be no certification, and this appears to be an action "for which there is no other adequate remedy in a court," as the issue whether the Secretary's failure to certify was lawful will not otherwise arise in litigation. Next, it appears that respondents are sufficiently "aggrieved" by the agency's action: under our decisions in *Sierra Club v. Morton*, 405 U.S. 727 [92 S.Ct. 1361, 31 L.Ed.2d 636] (1972), and *United States v. SCRAP*, 412 U.S. 669 [93 S.Ct. 2405, 37 L.Ed.2d 254] (1973), they undoubtedly have alleged a sufficient "injury in fact" in that the whale watching and studying of their members will be adversely affected by continued whale harvesting, and this type of injury is within the "zone of interests" protected by the Pelly and Packwood Amendments. *See Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 [90 S.Ct. 827, 25 L.Ed.2d 184] (1970). Finally, the Secretary has failed to point to any expressed intention on the part of Congress to foreclose APA review of actions under either Amendment. We find, therefore, that respondents are entitled to pursue their claims under the right of action created by the APA.

*Japan Whaling Ass'n. v. American Cetacean Soc'y.*, 478 U.S. 221, 231 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986).

In that case, which the defendants request this court to "consider ... in some detail"[11], the plaintiff Humane Society, Defenders of Wildlife *et alia* prayed for a writ mandamusing the defendant Secretary of Commerce to certify that Japan's practices "diminish the effectiveness" of the Whaling Convention. In denying such relief, not only was the Supreme Court unable to conclude that the Pelly Amendment to the Fishermen's Protective Act of 1967, 22 U.S.C. § 1978, and/or the Packwood Amendment to the Magnuson Fishery Conservation and Management Act,

---

**10.** *Warth v. Seldin*, 422 U.S. 490, 498 [95 S.Ct. 2197, 2205, 45 L.Ed.2d 343] (1975).

**11.** Defendants' Memorandum, p. 55.

16 U.S.C. § 1801 *et seq.*, required that result, on the facts presented the Court agreed that the executive agreement reached with Japan before the suit commenced had the potential to lessen the very harm of which the plaintiffs complained *viz.:*

> ... [I]t would better serve the conservation ends of the Convention to accept Japan's pledge to limit its harvest of sperm whales for four years and to cease all commercial whaling in 1988, rather than to impose sanctions and risk continued whaling by the Japanese[,]

478 U.S. at 232, by way of their mere formal objection to the regime timely filed. *See* 62 Stat. at 1718–19, T.I.A.S. No. 1849 art. V.

In any event, despite the Court's conclusion in that case that the plaintiff organizations were sufficiently aggrieved by the Secretary of Commerce's action in regard to the killing of the whales, the government's position at bar is that the subsequent decision in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), "should be the controlling precedent". Defendant's Memorandum, p. 32. As here, the plaintiffs there included The Humane Society of the United States and Defenders of Wildlife. They complained of a rule promulgated by the defendant Secretary of the Interior and revising prior interpretation of the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1536, to apply only to activities within the United States or on the high seas. Previously, that section, which requires interagency consultation to insure that federal programs do "not likely ... jeopardize the continued existence of any endangered ... or threatened species or result in the destruction or adverse modification of habitat of such species", had been interpreted to cover U.S. actions even in foreign countries. Again as here, the government contested the standing of the plaintiffs, who produced in opposition affidavits from two members of Defenders of Wildlife. One attested to past and intended future observation of the Nile crocodile and that she would "suffer harm in fact as the result of [the] American ... role ... in overseeing the rehabilitation of the Aswan High Dam"[12], while the other speculated

that a project funded by the Agency for International Development would harm her upon intended return to Sri Lanka in the hope of spotting the endangered elephant and leopard believed to be still there. *See* 504 U.S. at 565, 112 S.Ct. at 2139. The Court held that these failed to prove injury in fact or that it was redressable by the prayed-for recourse to the prior interagency rule. In other words, the plaintiffs did not bear their burden of proof as to either standing requirement.

On the first point, the Court accepted that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." 504 U.S. at 562–63, 112 S.Ct. at 2137–38.

> "But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." ... To survive the Secretary's summary judgment motion, respondents had to submit affidavits or other evidence showing, through specific facts, not only that listed species were in fact being threatened by funded activities abroad, but also that one or more of respondents' members would thereby be "directly" affected apart from their "'special interest' in th[e] subject."

504 U.S. at 563, 112 S.Ct. at 2137, quoting from *Sierra Club v. Morton,* 405 U.S. at 734–35, 735, 739, 92 S.Ct. at 1366, 1366, 1368. Further:

> ... Standing is not "an ingenious academic exercise in the conceivable," *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973), but as we have said requires, at the summary judgment stage, a factual showing of perceptible harm. It is clear that the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist. It is even plausible—though it goes to the outermost limit of plausibility—to think that a person who observes or works with

---

**12.** 504 U.S. at 563–64, 112 S.Ct. at 2138.

animals of a particular species in the very area of the world where that species is threatened by a federal decision is facing such harm, since some animals that might have been the subject of his interest will no longer exist, see *Japan Whaling Assn. v. American Cetacean Society*, 478 U.S. 221, 231, n. 4, 106 S.Ct. 2860, 2867 n. 4, 92 L.Ed.2d 166 (1986). It goes beyond the limit, however, and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection.

504 U.S. at 566–67, 112 S.Ct. at 2139–40.

Regarding redressability, the Court considered it the "most obvious problem in the ... case" [13] for several reasons: the agencies funding the foreign projects were not parties; the binding effect on those agencies of any revision of the rule of the Secretary of the Interior as to consultation on such projects was "very much an open question" [14] under ESA; any relief the district court could have granted against the Secretary "was not likely to produce" [15] action to redress the only injury in fact; and, since the "agencies generally supply only a fraction of the funding for a foreign project" [16], it was "entirely conjectural" [17] whether termination thereof would have the desired effect on such projects of concern to the environment.

### (2)

In attempting to rely on *Lujan*, the defendants would have this court conclude that the "plaintiffs have failed to adduce specific facts demonstrating that the triumvirate of Article III standing—injury-in-fact, causation, and redressability—have been met." Defendants' Memorandum, p. 44. That decision, however, in discussing the precise nature and implication of each of these elements [18], distinguishes between the "summary judgment stage" [19] of a controversy, which is the case here, and the "final stage". 504 U.S. at 561, 112 S.Ct. at 2137. At this dispositive-motion stage, for which both sides have opted in lieu of trial,

> the plaintiff can no longer rest on ... "mere allegations" [in its complaint], but must "set forth" by affidavit or other evidence "specific facts," ... which for purposes of the summary judgment motion will be taken to be true.

*Id.* This statement of law is based on Rule 56(e) of the Federal Rules of Civil Procedure, the consequence of which in the absence of controversion is the same as that of CIT Rule 56(i).

To repeat, not only do the plaintiffs attempt here to comply with this rule, the defendants have decided to attempt to rest on their record, such as it is, and also not to attempt to contest any of the averments of plaintiffs' Rule 56(i) statement by way of counterstatement filed in conformity therewith. Of course, this tactic has now left the defendants to challenge anew the declarations originally submitted in support of plaintiffs' application for immediate relief—and before slip op. 95–148 afforded both sides an opportunity to obtain additional evidence by way of discovery or otherwise.

### (a)

■ With regard to the issue of injury in fact, the defendants state that they "do not dispute that plaintiffs' activity—whale watching—is within the zone of interests sought to be protected by the 1992 Driftnet Act." Defendants' Memorandum, p. 32. What they do attempt to dispute, as outlined above, is that the injury alleged is not sufficiently imminent; that the claims of vocational and general harm to unidentified members of the plaintiff organizations are not actionable; that, to the extent such members are named, they fail to state their injuries with sufficient specificity; and that one such named mem-

---

**13.** 504 U.S. at 568, 112 S.Ct. at 2140.

**14.** *Id.*

**15.** 504 U.S. at 571, 112 S.Ct. at 2142.

**16.** *Id.*

**17.** *Id.*

**18.** *See* generally 504 U.S. at 559–62, 112 S.Ct. at 2135–37.

**19.** 504 U.S. at 561, 112 S.Ct. at 2137.

ber is not within the class of persons sought to be protected by the Driftnet Enforcement Act, *supra*.

None of these points, however well-presented, supports defendants' thesis in the light of the record before the court. Among other facts alleged by the plaintiffs and left unrefuted by the government are the listing of sperm whales as a species threatened with extinction [para. 70, *supra* ]; the indication of data available that the sperm-whale kill rate in the Mediterranean Sea is not sustainable [*id.*]; the estimate that ten sperm whales are entangled in driftnets each year [*id.*]; the estimate that 3000–5000 dolphins are also entangled [para. 68]; the conclusion of a scientific committee that the kill rates for striped dolphin in the Mediterranean exceeds their expected rate of reproduction [para. 69]; the finding that striped dolphins are the most common by-catch of Italian driftnets [*id.*]; the statement that the organizational purposes of the plaintiff organizations include protecting cetaceans from hazards such as driftnet fishing [para. 65]; the representation that The Humane Society of the United States, the Royal Society for the Prevention of Cruelty to Animals and the Whale and Dolphin Conservation Society have members who have engaged in whale and dolphin watching activities in and around the Mediterranean Sea and who have specific plans to return there for such activities in the future [para. 62, *supra* ]; and the statement that members of all of the plaintiff organizations obtain great benefit from watching whales and dolphins and other marine life [*id.*].

Two individual members who have presented themselves to the court are Erich Hoyt and George Berry. Again, while not directly attempting to controvert those parts of their original declarations set forth in paragraphs 63 and 64 above, the defendants have taken the position both in their brief and at the hearing that "these declarations do not meet the standards of specificity required by *Defenders of Wildlife*." Defendants' Memorandum, p. 25 (footnote omitted).

Come now Messrs. Hoyt and Berry with supplemental declarations for filing, which the defendants oppose as untimely or irrele-

vant. They are neither, given the nature of the relief for which the plaintiffs pray, as well as the concomitant, continuing demand of the defendants that any injury be both "imminent" and "concrete". *See, e.g., id.* Hence, plaintiffs' motion for leave to file them can be, and it hereby is, granted.

Whatever the arguable shortcomings of Mr. Hoyt's original declaration, he now adds:

1. I am planning to visit the Ligurian Sea in 1996 or 1997. At the March–April 1995 "Scientific Aspects of Managing Whale Watching" Workshop which I helped organize and served on the steering committee and as rapporteur, 30 top cetacean scientists agreed that effective marine sanctuaries and reserves are vital as monitoring areas and as controls for studying the effects of commercial whale watching. The Ligurian Sea is one such area, and I am planning to visit there to assess the value of this place, or a certain core part of the area, as a sanctuary from whale watching and other commercial use (it is already under consideration as a marine protected area by the various governments in the region).

2. As well as my continued professional interest in whale watching, I am currently working on a contract over the next 3 years with the Whale and Dolphin Conservation Society (Bath, UK) to assess and gather detailed information on the marine protected areas of the world, proposed and existing, which feature or include cetaceans. Because of the extraordinary concentration of fin whales in the Ligurian Sea, it is a prime candidate which I will be including in my research and final report. There may also be other areas in the Mediterranean suitable for improved protection and effective designation as a marine protected area, and I plan to talk extensively to other scientists, government agencies and NGOs working in the region.

3. Marine protected areas are often multi-use areas that combine recreational and some industrial use, as well as protection of fisheries, benthic flora and fauna, and larger fauna such as whales and dolphins. However, driftnetting is generally consid-

ered to be completely incompatible with a marine protected area.

4. As for the Ligurian Sea, I am in close touch with Dr. Giuseppe Notarbartolo di Sciara who studies fin whales in the Ligurian Sea and who first proposed it as a marine sanctuary/reserve, and I am hoping to visit the area to assess it in summer 1996, or if that is impossible, in summer 1997.

In his original declaration filed herein, George Berry stated that he is the editor of the membership magazine of the Whale and Dolphin Conservation Society, responsible for articles on cetaceans, including threats to their habitats. He claims to have gone whale watching in the Mediterranean Sea on several occasions, with a stated intent to return there in September 1995. At the hearing in December, however, the defendants brought out that this intention had not been realized.

This fact is confirmed by Mr. Berry's supplemental declaration dated January 17, 1996, which indicates he currently intends to visit the Mediterranean "later on in the year . . . most likely Southern France, Spain or Italy." To quote further:

2. The whale watching trip will play an important role in enabling me to perform my work responsibilities effectively. Promoting the educational, conservation and scientific benefits of whale watching, as well the commercial ones, is an integral part of WDCS's work. We publicize whale watching through our publications, including our membership magazine. . . . My whale-watching trips have helped provide valuable knowledge when writing for the magazine or our other publications. I also deal with the large number of inquiries we receive from our members and the general public requesting advice and information on where to go to see whales and dolphins. Many of these people are visiting the Mediterranean region, so my visit to the region would also help provide me with background information for our members as well as help in my work on our publications.

■ In critiquing these supplemental submissions of Messrs. Hoyt and Berry, such as they are, the defendants also return to a theme first raised in their brief and then at the hearing, namely, that Mr. Hoyt is a citizen of the United States but Mr. Berry is not. Thus, the latter is not even arguably within the class of persons sought to be protected by the statute underlying this case. The defendants cite *United States ex rel. Turner v. Williams*, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979 (1904), *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), and *DKT Memorial Fund v. Agency for International Development*, 887 F.2d 275 (D.C.Cir.1989), for support.

Of course, the focus in each of those cases was on the complainants vis-à-vis constitutional rights they sought to invoke. John Turner, for example, was determined to be an "alien anarchist" subject to deportation from United States pursuant to its immigration act of March 3, 1903, 32 Stat. 1213, and not at liberty to assert the rights obtaining in a land to which he did not belong as a citizen or otherwise. 194 U.S. at 292, 24 S.Ct. at 723. The Supreme Court relied on this principle, *inter alia*, in *Kleindienst* in affirming the U.S. Attorney General's determination under the Immigration and Naturalization Act of 1952, 66 Stat. 182, to exclude a Belgian journalist and a Marxist theoretician from coming here to speak. Finally, the court of appeals concluded in *DKT Memorial Fund* that foreign non-governmental organizations were not within the contemplation of the Foreign Assistance Act [20] restriction on the use of funds by AID in re abortion.

Clearly, the purview of the law governing this case is not so parochial. Slip op. 95–148 recognized the essential coincidence of international, European and U.S. law with respect to large-scale driftnet fishing. *See generally* 19 CIT at ——, 901 F.Supp. at 342–45. Indeed, in enacting the High Seas Driftnet Fisheries Enforcement Act, the Congress relied upon the following findings, among others:

(4) The United Nations, via General Assembly Resolutions numbered 44–225, 45–197, and most recently 46–215 . . ., has

---

20. 22 U.S.C. § 2151.

called for a worldwide moratorium on all high seas driftnet fishing by December 31, 1992, in all the world's oceans, including enclosed seas and semi-enclosed seas.

(5) The United Nations has commended the unilateral, regional, and international efforts undertaken by members of the international community and international organizations to implement and support the objectives of the General Assembly resolutions.

(6) Operative paragraph (4) of United Nations General Assembly Resolution numbered 46–215 specifically "encourages all members of the international community to take measures individually and collectively to prevent large-scale pelagic driftnet fishing operations on the high seas of the world's oceans and seas".

106 Stat. at 4900. And the policy of the United States is stated, in part, to be implementation of UN Resolution 46–215 and securing a permanent ban on the use of destructive fishing practices, and in particular large-scale driftnets, by persons or vessels fishing beyond the exclusive economic zone of any nation. 106 Stat. at 4901. Nothing in the text of the statute, *supra,* indicates a narrower zone of interest. In short, it borders on disingenuousness for the government to insinuate now that the plaintiffs are not within the worldwide zone it has striven to create [21] and that, notwithstanding the unrefuted facts set forth above, enforcement of the large-scale-driftnet prohibition therein has been so efficacious as to eliminate any harm to the species of concern. *Cf.* Defendants' Memorandum, pp. 33–36.

(b)

 With regard to the remaining standing requirements to be established, courts have recognized that "[r]edressability and causation analyses often replicate one another, particularly in cases where ... the relief requested is merely the cessation of illegal conduct." *E.g., Nat'l. Wildlife Federation v. Hodel,* 839 F.2d 694, 705 (D.C.Cir.1988).

Among additional facts alleged by the plaintiffs and unrefuted by the defendants are that many stranded cetaceans bear striation marks left by driftnet encounters [para. 67, *supra* ]; that large-scale driftnetting for swordfish is the principal cause of mortality in those instances where the probable cause of death could be determined [*id.*]; that the extremely high kill levels are attributed to the Italian swordfish driftnet fishery [para. 69]; that members of the plaintiff organizations are harmed by the diminishing numbers of dolphins and whales in and around the Mediterranean Sea as a result of large-scale driftnet fishing in Italy [para. 66, *supra* ]; and that, because cetaceans are migratory, cetacean fatalities from driftnet fishing in the Mediterranean may diminish the number of dolphins and whales to be viewed by their watchers elsewhere [*id.*]:

The unrefuted facts also tend to show that enforcement of the Driftnet Act will diminish, if not eliminate, the harm to such creatures and their plaintiff observers. For example, in his annual reports to Congress, the Secretary of Commerce has repeatedly stated "[a]lthough trade sanctions have never been imposed by the President, Pelly certifications and the threat of sanctions have been, in the main, effective in achieving adequate driftnet agreement and agreement compliance" [para. 77, *supra* ]; in the absence of economic pressure, Italy has been unwilling or unable to bring its driftnet fleet into compliance with the prohibitions on large-scale driftnet fishing [para. 78]; if the Secretary of Commerce identifies Italy under the statute, it would

---

**21.** *See, e.g.,* Defendant's Memorandum, p. 34:

> ... On December 20, 1991, the United Nations General Assembly, largely in response to continued efforts by the United States, adopted a resolution confirming the establishment of a moratorium on all large-scale driftnet fishing on the high seas to begin January 1, 1993. A.R. 9 (Exhibit 5). In addition, the European Union has enacted a regulation prohibiting vessels from keeping driftnets on board in excess of 2.5 kilometers, the maximum allowed

under the 1992 Driftnet Act. EEC No. 345/92 ¶ 8; A.R. 11 (Exhibit 10). Italian domestic law mirrors the European Union prohibition.[14]

The footnote, 14, continues in part:

> ... Based upon these recently enacted prohibitions, it is plausible to conclude that driftnet fishing on the scale documented by plaintiffs' studies has ceased.... In fact, the recently enacted legislation has probably increased whale and dolphin watching opportunities....

threaten that country with trade restrictions if an agreement is not reached to end the large-scale driftnet fishing [para. 71]; there is reason to believe that such an identification would place pressure on the Italian government to end large-scale driftnet fishing by its nationals [*id.*]; and an Italian official indicated that his government would react to trade restrictions by restricting large-scale driftnet fishing by its nationals [para. 72, *supra* ]. Indeed, the record currently before the court, as well as that developed earlier before Congress, indicate that the kind of enforcement provisions adopted can be and are effective in furtherance of underlying conservation policies. And the government cannot be heard to argue otherwise.

(3)

■ Courts have concluded that a party seeking judicial relief

> need not show to a certainty that a favorable decision will redress his injury. A mere likelihood will do.... [A] plaintiff need not "negate every speculative and hypothetical possibilit(y) ... in order to demonstrate the likely effectiveness of judicial relief."

*E.g., Nat'l. Wildlife Federation v. Hodel,* 839 F.2d at 705, 706, citing *Village of Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Regents of the Univ. of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Int'l. Ladies Garment Workers' Union v. Donovan,* 722 F.2d 795 (D.C.Cir.1983), *cert. denied sub nom. Breen v. Int'l. Ladies Garment Workers' Union,* 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); and quoting *Community Nutrition Inst. v. Block,* 698 F.2d 1239, 1249 (D.C.Cir.1983), *rev'd. on other grounds,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). Whatever the precise strength of plaintiffs' standing, this court cannot and therefore does not find that they are within the realm of "pure speculation and fantasy" [22] in which the plaintiffs were found in *Lujan* as a result of their complaint that the lack of consultation between U.S. agencies with respect to certain funded activities abroad "increas[es] the rate of extinction of endangered and threatened species" [23], that is, that the plaintiffs fail to show herein any "perceptible harm" [24] or to show they are within the "zone of interests to be protected or regulated by the statute" in question. *Director, Office of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.,* —— U.S. ——, ——, 115 S.Ct. 1278, 1283, 131 L.Ed.2d 160 (1995), quoting *Ass'n. of Data Processing Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Nor have the defendants proven otherwise.

III

In view of the foregoing findings of fact and conclusions of law, defendants' motion for judgment must be, and it hereby is, denied, while plaintiffs' motion for summary judgment must be, and it hereby is, granted. The parties are to confer and present to the court on or before March 15, 1996 a proposed form of final judgment in conformity with this opinion.

So ordered.

---

**22.** *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 567, 112 S.Ct. 2130, 2140, 119 L.Ed.2d 351 (1992).

**23.** 504 U.S. at 562, 112 S.Ct. at 2137.

**24.** 504 U.S. at 566, 112 S.Ct. at 2138, 119 L.Ed.2d 351.